UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

SUSAN PINSKY,                                    :

                              Plaintiff,         :

                                                     ECF
                - against -                       :
                                                     07 Civ. 3328 (CM) (HP)
JP MORGAN CHASE & CO.,                            :

                              Defendant.    :

-------------------------------------------------------------X


## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT


**JPMORGAN CHASE LEGAL AND COMPLIANCE DEPARTMENT**
Frederic L. Lieberman
Assistant General Counsel
One Chase Manhattan Plaza, Floor 26
New York, New York 10081
(212) 552-1815
frederic.l.lieberman@jpmchase.com

Attorneys for Defendant

# TABLE OF CONTENTS

Page

Table of Authorities.................................................................. i

Preliminary Statement.............................................................. 1

Statement of Facts.................................................................. 2

The Disability and Reasonable Accommodation Policy...................... 3

Pinsky's Request for a Reasonable Accommodation......................... 3

The Severance Pay Plan............................................................ 7

The Bank Eliminates All HELO Positions and Proposes to Terminate Pinsky's
    Employment.................................................................... 7

The Disability Leave Policy........................................................ 8

Pinsky's Disability Leave........................................................... 9

The Code of Conduct............................................................... 11

Pinsky's Relationship with Tri-State Biodiesel LLC........................... 12

This Action............................................................................ 12

ARGUMENT.......................................................................... 13

I       THE COURT SHOULD GRANT SUMMARY JUDGMENT BECAUSE
       THERE ARE NO GENUINE ISSUES OF MATERIAL FACT AS TO
       PINSKY'S CLAIMS AND THE BANK'S COUNTER-CLAIMS.............. 13

II     ALL OF PINSKY'S CLAIMS SHOULD BE DISMISSED BECAUSE SHE
       RELEASED HER RIGHT TO BRING THOSE CLAIMS..................... 14

       A.    The Release Agreement Covers All of Plaintiff's Claims in This
           Action.................................................................. 14

       B.    Pinsky's Claims Accrued Prior to Her Execution of the Release
           Agreement.............................................................. 15

       C.    The Release Agreement is Enforceable Under Federal and State Law.    15

      1.    Plaintiff's ADA Claim………………………………………………… 15

      2.    Plaintiff's State Law Claims………………………………….. 17

III    THE UNDISPUTED FACTS ESTABLISH THAT PINSKY'S FAILURE
       TO ACCOMMODATE CLAIMS ARE WITHOUT MERIT AND
       SHOULD BE DISMISSED………………………………………………… 18

IV    THE UNDISPUTED FACTS ESTABLISH THAT PINSKY VIOLATED
       JPMORGAN CHASE'S CODE OF CONDUCT WHEN SHE
       PERFORMED SERVICES FOR, ACTED AS AN OFFICER OF, AND
       INVESTED IN TRI-STATE BIODIESEL WHILE STILL A BANK
       EMPLOYEE………………………………………………………………… 21

Conclusion…………………………………………………………………………… 23

TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S. Ct. 1011 (1974)                          15

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505 (1986)                       14

Bormann v. AT & T Communications, Inc., 875 F.2d 399 (2nd Cir.), cert. denied,
    493 U.S. 924 (1989)                                                                     18

Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548 (1986)                              13

Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2nd Cir. 1994)                            13

Clark v. Buffalo Wire Works Co., Inc., 3 F. Supp.2d 366 (W.D.N.Y. 1998)                     17

Constance v. Pepsi Bottling Co. of New York, CV 03-5009 (CBA),
    2007 WL 2460688 (E.D.N.Y. Aug. 24, 2007)                                               19, 20

Cordoba v. Beau Dietl & Associates, 02 Civ. 4951 (MBM), 2003 WL 22902266
    (S.D.N.Y. Dec. 8, 2003)                                                                 15, 16,
                                                                                            17, 18

Cramer v. Newburgh Molded Products, Inc., 228 A.D.2d 541, 645 N.Y.S.2d 46 (2nd
    Dep't), lv. den., 89 N.Y.2d 803, 653 N.Y.S.2d 280 (1996)                               17

Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2nd Cir. 1998)                                  14

EEOC v. Yellow Freight System, Inc., 98 Civ. 2270 (THK), 2002 WL 31011859
    (S.D.N.Y. Sept. 9, 2002)                                                                19

Felix v. New York City Transit Auth., 154 F. Supp.2d 640, 655 (S.D.N.Y. 2001),
    aff'd, 324 F.3d 102 (2nd Cir. 2003)                                                     19

Francis v. Runyon, 928 F. Supp. 195 (E.D.N.Y. 1996)                                          20

Hartnett v. Fielding Graduate Inst., 400 F. Supp.2d 570, 581 (S.D.N.Y. 2005),
    aff'd, 198 Fed. Appx. 89 (2nd Cir. 2006)                                                19

Hsueh v. The Bank of New York, 05 Civ. 5345 (JSR), 2006 WL 2778858 (S.D.N.Y.
    Sept. 26, 2006)                                                                         15, 16

Livingston v. Adirondack Beverage Co., 141 F.3d 434 (2nd Cir. 1998)                         16

Mergler v. Crystal Properties Assoc., Ltd., 179 A.D.2d 177, 583 N.Y.S.2d 229, 232 (1st
    Dep't 1992).                                                                            17

Misek-Falkoff v. IBM Corp., 854 F. Supp. 215 (S.D.N.Y. 1994), aff'd, 60 F.3d 811
    (2nd Cir.), cert. denied, 516 U.S. 991, 116 S. Ct. 522 (1995)                    20

Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10 (2nd Cir. 1993)                15

Pampillonia v. RJR Nabisco, Inc., 138 F.3d 459 (2nd Cir. 1998)                      17

Simel v. JP Morgan Chase, 05 Civ. 9750 (GBD), 2007 WL 809689 (S.D.N.Y.
    Mar. 19, 2007)                                                                   17

Pimentel v. Citibank, N.A., 29 A.D.2d 141, 811 N.Y.S.2d 381 (1st Dep't),
    lv. den., 7 N.Y.3d 707, 821 N.Y.S.2d 813 (2006)                                 19

Rodal v. Anesthesia Group of Onandago, PC, 369 F.3d 113 (2nd Cir. 2004)             19

Skluth v. United Merchants & Manufacturers, Inc., 163 A.D.2d 104, 106, 559 N.Y.S.2d
    280 (1st Dep't 1990)                                                            17

Williams v. British Airways, PLC, 04-CV-0471 (CPS), 06-CV-5085 (CPS), 2007
    WL 2907426 (E.D.N.Y. Sept. 27, 2007)                                           19

Woroski v. Nashua Corp., 31 F.3d 105 (2nd Cir. 1994)                                14

Wynne v. Tufts Univ. School of Medicine, No. 99-1105-Z, 1992 WL 46077
    (D. Mass. Mar. 2, 1992), aff'd, 976 F.2d 791 (1st Cir. 1992), cert. denied,
    507 U.S. 1030, 113 S. Ct. 1845 (1993)                                          20

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

JPMorgan Chase Bank, N.A. ("the Bank" or "JPMorgan Chase"), incorrectly named as JP Morgan Chase & Co., by and through its attorneys, respectfully submits this Memorandum of Law in support of its motion for summary judgment. The Bank's motion should be granted and Susan Pinsky's failure to accommodate claims dismissed because the undisputed facts establishes that Pinsky released all such claims against the Bank. Alternatively, the Bank's motion should be granted because the undisputed facts show that the Bank did provide Pinsky with a reasonable accommodation, albeit not in the precise form recommended by Pinsky's chiropractor. Accordingly, Pinsky's Amended Complaint, her claims pursuant to the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. ("NYSHRL"), the New York City Human Rights Law, N.Y.C. Administrative Code § 8-101 et seq. ("NYCHRL"), and the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), along with this action, should be dismissed.

In addition, the Bank's summary judgment motion as to its counter-claims should be granted. The undisputed facts show that, while still employed by the Bank and subject to its Code of Conduct, but while on a disability leave, Pinsky nonetheless performed services for another company and invested in that company. Moreover, Pinsky did so without notifying the Bank that she was doing so or complying with the Bank's outside business activities pre-clearance requirements. As a result, she violated the terms and conditions of her employment with the Bank, and wrongfully obtained benefits from the Bank that she would not have received had the Bank known of her actions.

## STATEMENT OF FACTS

Pinsky was a Personal Financial Advisor Assistant with Chase Investment Services Corp., a subsidiary of JPMorgan Chase & Co., from November 2002 through January 2004. Rule 56.1 Stmt. ¶¶ 5-6. She then was hired by JPMorgan Chase Bank, another subsidiary of JPMorgan Chase & Co., effective February 1, 2004, to be a Home Equity Loan Officer ("HELO"). Id. ¶ 6. Qualifications for the HELO position included a Bachelors degree, two years experience with home finance sales, and knowledge of home lending industry and credit principals. Id. ¶ 7. The Bank's HELOs were responsible for supporting all aspects of the Bank's Home Equity Sales Process, including developing referrals from Chase Business Partners and generating new business, training and coaching Retail Financial Services, Private Financial Services and Small Business Financial Services personnel in managed branches regarding developing home equity referrals, and processing branch generated Home Equity leads. Id. ¶ 8. As of February 2005, Pinsky's work location was moved to the Bank's retail branch at 55 Water Street. Id. ¶ 9.

Before her employment with JPMorgan Chase, Pinsky received a Bachelor of Arts degree from Baruch College in June 2002. Rule 56.1 Stmt. ¶ 1. At the time Pinsky worked for the Bank, she had Series 7 and 66 securities licenses, as well as a Life & Health Insurance license, from a financial industry self-regulatory organization. Id. ¶ 2. In addition, between June 1997 and May 2005, Pinsky was employed as a Technical Recruiter for Interim Technology, The Consulting Group, as a Senior Technical Recruiter for Excel Partners, as a New York Metro Account Manager for Jobs.com, as a Financial Advisor for Merrill Lynch, as an Personal Financial Advisor Assistant for Chase Investment Services Corp., and as a Home Equity Loan Officer for the Bank. Id. ¶ 3.

## THE DISABILITY AND REASONABLE ACCOMMODATION POLICY

JPMorgan Chase & Co. has a domestic firm-wide Disability and Reasonable Accommodation Policy (the "Reasonable Accommodation Policy"). Rule 56.1 Stmt. ¶ 10. The Firm "is committed to providing necessary and reasonable accommodations with respect to a known physical or mental disability of a qualified ... employee when needed ... to perform essential job functions." Id. ¶ 11. A "reasonable accommodation is a change in the work environment or in the way 'things are usually done' including, but not limited to, leave time, specialized equipment, etc., that enables a qualified person with a disability to perform the essential functions of his or her job and which does not cause an undue hardship to JPMorgan Chase...." Id. ¶ 12. "The reasonableness of an accommodation and the issue of undue hardship to the firm are evaluated on a case-by-case basis." Id. ¶ 13. Finally, The Reasonable Accommodation Policy provided that an employee's "Human Resources Business Partner ... will work together with you and your manager to evaluate your request and determine whether a reasonable accommodation is necessary and appropriate." Id. ¶ 14.

## PINSKY'S REQUEST FOR A REASONABLE ACCOMMODATION

On February 8, 2005, Pinsky first notified her Human Resources Business Partner, Barbara Zimmer, and her manager, Dee Lakhani, that she was requesting that she be provided with a standing desk because of back problems. Rule 56.1 Stmt. ¶ 15. A standing desk is one on which the height of the work surface can be adjusted and thus can be used either while standing or sitting. Id. ¶ 16. Zimmer told Pinsky that she needed to submit medical documentation regarding her condition to the Bank's Medical Department. Id. ¶ 17.

More than two weeks later, Pinsky advised Zimmer that she had obtained medical documentation from her chiropractor. Rule 56.1 Stmt. ¶ 18. The chiropractor's note stated that

Pinsky had "lower back pain and muscle spasm, secondary to an Acute Strain/Sprain Syndrome of the Lumbosacral Spine and pelvis", should "refrain from extended periods of sitting (not to exceed 20 to 30 minutes)", and "would benefit from the use of a 'standing desk', to avoid having to sit while working for more than the recommended time frame". Id. ¶ 19. According to Pinsky, she faxed a copy of the letter to Miriam Negron on February 24, 2005, although she does not have any proof that it was received. Id. ¶¶ 20, 22. Negron, the Regional Manager for the Bank's Medical Department, does not have any recollection, and the Medical Department does not have any record, of receiving a facsimile from Pinsky at that time. Id. ¶¶ 21, 23.

Almost three weeks later, Pinsky advised Zimmer that she had not heard anything from the Medical Department regarding her request for a standing desk. Rule 56.1 Stmt. ¶ 24. On March 17, 2005, in response, Zimmer asked Pinsky to whom in the Medical Department she had sent the facsimile. Id. ¶ 25. Pinsky responded two weeks later that she remembered sending the facsimile to a person that Zimmer had identified for her, but admitted that she could not find her copy of the facsimile. Id. ¶ 26.

On April 4, 2005, Pinsky complained to Zimmer that: "I still have no standing desk. Exactly how long do I have to wait for it. I don't remember who I faxed the info to. It was to the name and number you gave me." Rule 56.1 Stmt. ¶ 27. Later that afternoon, Zimmer responded: "I believe that the person whose name we were originally given may have left the bank. I have asked someone else in Health Services to follow-up. I would also suggest that you ask your manager, Dee, to follow-up as well. They cannot give her medical information but they should be able to tell her the status of the request." Id. ¶ 28.

On April 4, 2005, Pinsky faxed a copy of the letter from her chiropractor to the Medical Department. Rule 56.1 Stmt. ¶ 29. That same day, Cindy Chan, a nurse in the Bank's Medical

4

Department, sent an email to Lakhani, Pinsky, and Zimmer approving Pinsky's request for a reasonable accommodation. Id. ¶ 30. That next day, Zimmer reminded Lakhani that: "since [Pinsky] is a HELO I assume that she has only 90 days remaining[, i]n that case, there may be less expensive alternatives that Medical can recommend [and u]sually the medical department calls the manager to discuss before just sending a request for the accommodation, I suggest that you call Cindy and have a conversation about the options." Id. ¶ 31. Less than two days later, on April 6, 2005, Pinsky complained to Lakhani and Chan: "Do you know when my standing desk will be arriving? My back is killing me and right now I am working with my keyboard lodged atop a moving box." Id. ¶ 32.

On April 8, 2005, Lakhani proposed to Zimmer and Chan an alternative accommodation to the standing desk. Rule 56.1 Stmt. ¶ 35. In her email, Lakhani wrote that: "[M]y only concern is ordering this desk today, getting it a month from now and [Pinsky] using it for a total of 3 weeks (her last day is June 30th). Not only are we spending money on it, but the Water Street Branch will have no use for this desk afterwards and they will not have the space to leave it there so we will have to discard it. They will need to throw it away to make room for a banker (with a regular desk). I just spoke to Sales Manager there [Migdalia Centeno] and asked if Susan can stand at the Customer Service desk in the back of the branch there is no traffic) and she said it may work. I ran this by Susan this morning and she thought it would be a good idea as well. I don't know what a standing desks looks like but the way Susan described it to me, it is no different than the customer service desk. Let me know if this is okay or is it mandatory that I order this desk?" Id. ¶ 36. Later that day, Chan advised Lakhani: "You do not need to order the desk as long as she can be accommodated by standing at the Customer Service Desk until she leaves her employment with JPMC on June 30th." Id. ¶ 42.

The Bank's Customer Service Desk is a taller desk, at least waist height or higher, at which Bank employees either can sit or stand. Rule 56.1 Stmt. ¶ 40. Employees who sit at the Bank's Customer Service Desk have adjustable chairs so that employees of different heights can use the chairs and Desk while working. Id. ¶ 41. Both Lakhani and Centeno testified that Pinsky agreed o use the Customer Service Desk. Id. ¶¶ 34, 39.

From on or about April 8, 2005 through May 31, 2005, Pinsky did not send any emails to Lakhani or Zimmer complaining about working at the Customer Service Desk or inquiring about the standing desk. Rule 56.1 Stmt. ¶ 46. Then, on May 31, 2005, Pinsky complained to Lakhani and Zimmer about her back and asking whether there was "any word on [her] standing desk". Id. ¶ 47. On June 1, 2005, Lakhani replied to Pinsky: "I was under the impression that you were standing at the CS service desk in the back which is a standing desk and that you did not want to order one b/c you can stand at that desk. Dolly and I spoke about this and then I called you and you decided that it would be the best way to go. Am I missing something?" Id. ¶ 48. That same day, Pinsky responded to Lakhani: "Yes, you are missing quite a lot. I requested the standing desk originally in January. Then since nothing was done about it I called HR and they had me put in a second request for it. Dolly came up with the idea of using the service desk a month after the second time the desk was requested. Although the service desk is a lot better than the regular desk, it lacks the ability to provide sufficient support when I actually do sit. All this time, I was under the impression that the desk had been ordered, and I was using the service desk until it arrived." Id. ¶ 49. The next day, Zimmer wrote to Pinsky: "From what I recall, Chase Medical approved of the service desk as a reasonable accommodation for your needs. They would have based their decision on the information provided from your physician as to what you required. Since your position is being eliminated, and we were looking for a short term solution, this was

deemed an appropriate way to meet your accommodation. There was not a desk ordered for you." Id. ¶ 50.

## THE SEVERANCE PAY PLAN

JPMorgan Chase & Co. has a Severance Pay Plan that sets forth certain benefits that may be available to eligible employees. Rule 56.1 Stmt. ¶ 51. The Severance Pay Plan offers various forms of assistance, including financial assistance, to employees "whose employment involuntarily terminates as a result of the events specified in this Plan". Id. ¶ 52. One of the "events" specified in the Plan is "an elimination ... of the job position or functions held or performed by the Employee". Id. ¶ 53. The Severance Pay Plan "condition[s] the effectiveness of the Notification and the payment of severance on the execution of a release". Id. ¶ 54. The Severance Pay Plan further provides that only "an Employee who is not on a Leave of Absence may be a participant" in the Plan. Id. ¶ 55.

## THE BANK ELIMINATES ALL HELO POSITIONS AND PROPOSES TO TERMINATE PINSKY'S EMPLOYMENT

Beginning in late 2004 and continuing through mid-2005, the Bank advised its Home Equity Loan Officers, including Pinsky, that it was going to eliminate all HELO positions. Rule 56.1 Stmt. ¶ 56. As a result, on or about May 20, 2005, Lakhani provided Pinsky with formal written notice that her position was being eliminated and her employment would be terminated as of July 18, 2005. Id. ¶ 57. The notice letter provided Pinsky with sixty (60) days paid notice of the elimination of her position and the proposed termination of her employment. Id. ¶ 58. The notice letter also offered Pinsky seven (7) weeks of severance pay if she did not obtain another position with JPMorgan Chase during that period, on condition that Pinsky execute a proposed Release Agreement. Id. ¶ 59. The consideration offered Pinsky in exchange for her entering into

the Release Agreement exceeded the benefits to which Pinsky already was entitled, since Pinsky had no other right to any severance benefits. Id. ¶ 60.

The Bank encouraged Pinsky to consult an attorney regarding the proposed Release Agreement. Rule 56.1 Stmt. ¶ 61. Pinsky was given forty-five (45) days in which to consult an attorney regarding, and to consider, the proposed Release Agreement before needing to execute and return it in order to agree to its benefits. Id. ¶ 62.

Pinsky read the release and "pretty much" understood it. Rule 56.1 Stmt. ¶ 63. Pinsky had the Release Agreement for approximately four to five weeks before she executed and returned it to Chase. Id. ¶ 64. On June 24, 2005, Pinsky executed the proposed Release Agreement and returned it to JPMorgan Chase. Id. ¶ 65. As a result, Pinsky agreed to "release to the fullest extent permitted by law JPMorgan Chase Bank (and any predecessor or successor entities thereof) and its and their affiliates, subsidiaries, parent corporations (including J.P. Morgan Chase & Co.) … (hereinafter "JPMC" or "RELEASEES") from any and all suits, claims, charges, obligations, causes of action or demands in law or in equity … arising from or relating to my employment relationship with JPMC and/or the termination thereof, from the beginning of the world up to and including the date of execution of this Release (whether known or unknown to me and including any continuing effects of any acts or practices prior to the date of execution of this RELEASE), including, but not limited to: … any employment and/or benefit related claims under any federal, state or local law, employment law or civil rights law…." ¶ 66.

### THE DISABILITY LEAVE POLICY

JPMorgan Chase & Co. also has a domestic firm-wide Disability Leave Policy. Rule 56.1 Stmt. ¶ 67. The Disability Leave Policy provides time off for employees when they have an illness or injury that continues for more than one workweek. Id. ¶ 68. It provides that a disability

8

leave is available if an employee is unable to perform the material and substantial duties of his/her position on an active employment basis. Id. ¶ 69.

The Disability Leave Policy stated that it "provides disability pay benefits in the form of full or partial pay for eligible employees," Rule 56.1 Stmt. ¶ 70, after "a one-week wait period, i.e., seven consecutive calendar days" Id. ¶ 71. "Beginning on the eighth consecutive calendar day of your disability leave, you may be eligible to receive disability pay benefits at either 100% or 60% pay (up to a total of 25 weeks within a calendar year), in accordance with the Disability Pay Benefits Schedule below [: for 3 to 4 years of recognized service, 7 weeks at 100% and 18 weeks at 60%]." Id. ¶ 72.

An employee can continue many elected benefits while on disability leave. Rule 56.1 Stmt. ¶ 76. In addition, if the disability continues after 26 weeks, an employee can receive long-term disability benefits, if LTD benefits coverage had previously been elected. Id. ¶ 73. When an employee is approved for long-term disability benefits, the employee will be placed on LTD employment status. Id. ¶ 74.

Finally, the Disability Leave Policy provides that, when an employee's position is eliminated during an approved disability leave, the employee's employment termination date typically will be deferred until the employee's disability leave has ended. Id. ¶ 75. The Disability Leave Policy also stated that "[y]our employment may be terminated if it is determined that you, either before or during your leave, committed a material violation of the firm's Code of Conduct or a major violation of any JPMorgan Chase policies." Id. ¶ 77.

### PINSKY'S DISABILITY LEAVE

Pinsky first submitted documentation regarding her back condition from her chiropractor to the Bank's Medical Department on or around April 4, 2005. Rule 56.1 Stmt. ¶ 78. Then, on

June 8, 2005, Pinsky advised Lakhani and Zimmer: "Due to the deterioration of my back condition (as shown in my MRI), my physicians have instructed that I cease to work immediately…. I intend to finish working at the end of next week as planned, working half to full days." Id. ¶ 79. That same day, Zimmer replied: "If you have been directed by your physician to cease work immediately, I need to ask that you comply with his directive. Please finalize anything that you are working on and we will process a request for a leave of absence. I will ask that Dee begin your Leave of Absence effective immediately." Id. ¶ 80.

Accordingly, Pinsky commenced a short-term disability leave of absence from her employment with the Bank beginning on or around June 13, 2005. Rule 56.1 Stmt. ¶ 81. She was approved for, and received, short-term disability benefits for the period from June 13, 2005 through December 11, 2005. Id. ¶ 82. Since Pinsky had elected long-term disability coverage under the Bank's employee benefit plan for the 2002, 2003, 2004, 2005, 2006, and 2007 benefits years, id. ¶ 83, and because, effective December 12, 2005, Pinsky was approved by The Hartford for long-term disability benefits, id. ¶ 84, Pinsky was placed on LTD leave status as of December 12, 2005. Id. ¶ 85.

On July 10, 2007, Pinsky's surgeon cleared her to return to work. Rule 56.1 Stmt. ¶ 86. On August 9, 2007, The Hartford, the insurance carrier for the Bank's long-term disability policy, advised Pinsky that her long-term disability benefits were being terminated as of July 10, 2007 based on information submitted by Pinsky's health care providers. Id. ¶ 87. Since Pinsky's long-term disability benefits had been terminated, on September 13 and 14, 2007, Defendant paid Pinsky ten (10) weeks of severance pursuant to the Severance Pay Plan. Id. ¶ 88.

Pinsky elected medical, dental, and vision coverage for the 2006 and 2007 benefits years under the Bank's benefit plan. Rule 56.1 Stmt. ¶ 89. Under the Bank's benefit plan, medical,

dental, and vision coverage are paid in part by the employee and in part by the Bank. Id. ¶ 90. The Bank has paid for medical, dental, and vision coverage for Pinsky for the 2006 and 2007 benefits years. Id. ¶ 91.

### THE CODE OF CONDUCT

JPMorgan Chase & Co. has a firm-wide Code of Conduct. Rule 56.1 Stmt. ¶ 92. The Code of Conduct applies to all employees, including those on disability leaves. Id. ¶ 93. Compliance with the Code of Conduct and with other applicable policies and procedures is a term and condition of by JPMorgan Chase. Id. ¶ 95. The Code of Conduct was and is available to all employees on the Firm's intranet website. Id. ¶ 96.

Section 6.3.2 of the November 2004 Code of Conduct, in effect from November 2004 through February 2006, provided that:

"Subject to the exclusions listed below, you are required to pre-clear:

- any outside activity for which you will be paid, including a second job.

- whether or not you will be paid, any affiliation with another business as a director, officer, advisory board member, general partner, owner, consultant, holder of 5% or more of the business' voting equity interests, or in any similar position." Rule 56.1 Stmt. ¶ 97; see also id. ¶¶ 98, 99.

All JPMorgan Chase employees are required to affirm their understanding of, and compliance with, the Code of Conduct on a recurring basis. Rule 56.1 Stmt. ¶ 100. Pinsky affirmed that she would comply with the Code of Conduct on December 18, 2002, October 21, 2003, and March 3, 2005. Id. ¶ 101.

## PINSKY'S RELATIONSHIP WITH TRI-STATE BIODIESEL LLC

On April 20, 2007, JPMorgan Chase learned that Pinsky was identified as being associated with Tri-State Biodiesel LLC ("Tri-State"), an alternative fuel company. Rule 56.1 Stmt. ¶ 103. According to Tri-State's website as of April 20, 2007, "Susan Pinsky, Chief Administration Officer - Susan recently left her position as an Assistant Treasurer at JP Morgan Chase to join the Tri-State Biodiesel team…. Her expertise in management and her leadership skills have made her the perfect fit to build the corporate structure of our company. She currently manages all the City and State Licensing, the Company registrations and the financials." Id. ¶ 104. No later than July 9, 2007, Tri-State changed its entry regarding Pinsky by deleting the reference to JPMorgan Chase, but otherwise leaving the description of Pinsky's relationship to Tri-State unchanged. Id. ¶ 105. Pinsky also has identified herself as Tri-State's Chief Administration Officer, its corporate secretary and an officer of the company. Id. ¶¶ 108, 109. Pinsky also was and is an investor in Tri-State. Id. ¶ 107.

Pinsky neither requested, nor received, any pre-clearance from the Bank regarding her performance of services for Tri-State Biodiesel, despite being required to do so by the JPMorgan Chase Code of Conduct. Rule 56.1 Stmt. ¶ 110. Pinsky neither requested, nor received, any pre-clearance from the Bank regarding her investments in Tri-State Biodiesel, despite being required to do so by the JPMorgan Chase Code of Conduct. Id. ¶ 111.

### THIS ACTION

On or about February 6, 2006 Pinsky filed a Complaint of Discrimination with the New York State Division of Human Rights. Rule 56.1 Stmt. ¶ 112. On March 27, 2007, Pinsky filed her Complaint in this action in New York State Supreme Court, asserting claims of disability discrimination under the New York State Human Rights Law and the New York City Human Rights Law. Id. ¶ 113. On April 26, 2007, Defendant removed this action from New York State

Supreme Court, New York County, to the United States District Court for the Southern District of New York. Id. ¶ 115.

On April 26, 2007, the New York State Division of Human Rights issued an Annulment Determination regarding Pinsky's Complaint of Discrimination. Rule 56.1 Stmt. ¶ 116. On May 15, 2007, Defendant filed its Answer to Pinsky's Complaint. Id. ¶ 117. On June 4, 2007, Defendant filed its Amended Answer and Counterclaims to Pinsky's Complaint. Id. ¶ 119.

On June 1, 2007, the Equal Employment Opportunity Commission issued a Dismissal and Notice of Rights to Plaintiff. Rule 56.1 Stmt. ¶ 118. On September 12, 2007, Pinsky filed a First Amended Complaint in this action, asserting an additional claim of disability discrimination under the Americans with Disabilities Act. Id. ¶ 120. According to the allegations of the Complaint, all of Plaintiff's claims accrued during a period between February 24, 2005 (when she claims to have first requested a reasonable accommodation) and June 13, 2005 (when she began her leave of absence). Id. ¶ 121. On January 30, 2008, Defendant filed its Answer and Counterclaims to Pinsky's Amended Complaint. Id. ¶ 122.

### ARGUMENT

### I

#### THE COURT SHOULD GRANT SUMMARY JUDGMENT BECAUSE THERE ARE NO GENUINE ISSUES OF MATERIAL FACT AS TO PINSKY'S CLAIMS AND THE BANK'S COUNTER-CLAIMS

Summary judgment is warranted when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548 (1986). The court views the record "in the light most favorable to the party opposing the motion" by resolving "all ambiguities and draw[ing] all factual inferences in favor of [that] party." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2nd Cir. 1994). Its inquiry is "whether the evidence present is sufficient to require submission to

a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Anderson v.</u>

<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986); <u>Woroski v. Nashua</u>

<u>Corp.</u>, 31 F.3d 105, 109-10 (2nd Cir. 1994). Thus, summary judgment then is "fully appropriate,

indeed mandated, when the evidence is insufficient to support the non-moving party's case."

<u>Distasio v. Perkin Elmer Corp.</u>, 157 F.3d 55, 61-62 (2nd Cir. 1998).

<strong>II</strong>

## ALL OF PINSKY'S CLAIMS SHOULD BE DISMISSED BECAUSE SHE RELEASED HER RIGHT TO BRING THOSE CLAIMS

Defendant's motion should be granted and Pinsky's action dismissed because she entered

into a valid agreement with the Bank releasing, <u>inter alia</u>, all of the claims she asserts in this

action. The Release Agreement covers all employment-related claims, including those under

"any federal, state or local law, [or] employment law", all of the claims herein had already accrued

at the time Plaintiff executed the Release Agreement, and Plaintiff's entry into the Release

Agreement was knowing and voluntary.

### A.    THE RELEASE AGREEMENT COVERS ALL OF PLAINTIFF'S CLAIMS IN THIS ACTION.

In her Amended Complaint, Pinsky asserts claims for disability employment

discrimination under the NYSHRL, the NYCHRL, and the ADA. Ex. "51" ¶¶ 19-21. In the

Release Agreement, Pinsky released all claims she had or may have had in relation to her

employment with the Bank. Specifically, the Release Agreement states that it applied to:

> "all suits, claims, charges, obligations, causes of action or demands in law or in
> equity … arising from or relating to my employment relationship with JPMC and/or
> the termination thereof, … including, but not limited to: … any employment and/or
> benefit related claims under any federal, state or local law, employment law or civil
> rights law …."

14

Stmt. ¶ 66. Discrimination claims under the NYSHRL, the NYCHRL, and the ADA certainly are "employment … related claims under any federal, state or local law, [or] employment law…." Id. Therefore, the Release Agreement applies to the types of claims asserted by Plaintiff.

**B.    PINSKY'S CLAIMS ACCRUED PRIOR TO HER EXECUTION OF THE RELEASE AGREEMENT.**

According to the allegations of the Amended Complaint, all of Pinsky's claims accrued during a period between February 24, 2005 (when she claims to have first submitted her request for a reasonable accommodation) and June 13, 2005 (when she began her leave of absence). Stmt. ¶ 121. Such claims fall well within the time frame covered by the specific language of the Release Agreement, which states that it applied to "all … claims … up to and including the date of execution of this Release (whether known or unknown to me and including any continuing effects of any acts or practices prior to the date of execution of this RELEASE) …." Stmt. ¶ 66. Plaintiff executed the Release Agreement on June 24, 2005. Id. ¶ 65. Therefore, the Release Agreement applies to the claims asserted by Plaintiff, all of which had accrued no later than June 13, 2005.

**C.    THE RELEASE AGREEMENT IS ENFORCEABLE UNDER FEDERAL AND STATE LAW.**

**1.    PLAINTIFF'S ADA CLAIM.**

For purposes of determining the enforceability of the Release Agreement, Pinsky's ADA claim is governed by federal law. Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10, 15 (2nd Cir. 1993). Under federal law, "an employee may validly waive a discrimination claim so long as the waiver is made knowingly and voluntarily." Cordoba v. Beau Dietl & Associates, 02 Civ. 4951 (MBM), 2003 WL 22902266 *4 (S.D.N.Y. Dec. 8, 2003) (citing Alexander v. Gardner-Denver Co., 415 U.S. 36, 52 n.15, 94 S. Ct. 1011, 1021 n.15 (1974)); Hsueh v. The Bank of New York, 05 Civ. 5345 (JSR), 2006 WL 2778858 *3 (S.D.N.Y. Sept. 26, 2006) (claims waived included ADA claim). In the Second Circuit, a "totality of the circumstances"

inquiry [is used] to determine whether a release of Title VII claims is knowing and voluntary."

Cordoba, 2003 WL 22902266 *5; Livingston v. Adirondack Beverage Co., 141 F.3d 434, 438

(2nd Cir. 1998). Relevant factors include

> "(1) the plaintiff's education and business experience; (2) the amount of time the plaintiff had possession of or access to the release before signing it; (3) the plaintiff's role in deciding the terms of the release; (4) the clarity of the release; (5) whether the plaintiff was represented by or consulted an attorney; (6) whether the consideration given in exchange for the employee's waiver exceeds benefits to which the employee was already entitled by contract or law; (7) whether the employer encouraged the employee to consult an attorney; and (8) whether the employee had a fair opportunity to do so."

Id.; Hsueh, 2006 WL 2778858 *4. These factors are more than satisfied here.

Pinsky's education and business experience, especially in the financial services industry, is more than sufficient. According to information supplied by Pinsky, she earned a B.A. from Baruch College in June 2002, Stmt. ¶ 1, and obtained Series 7 and 66 securities licenses, as well as a Life & Health Insurance license, from a financial industry self-regulatory organization. Id. ¶ 2. In addition, as of June 2005, Pinsky had been employed as a Technical Recruiter, a Senior Technical Recruiter, an Account Manager, a Financial Advisor, a Personal Financial Advisor Assistant, and a Home Equity Loan Officer. Id. ¶ 3.

Pinsky was given forty-five (45) days in which to consult an attorney regarding, and to consider, the Release before needing to execute and return it in order to agree to its benefits. Stmt. ¶ 62, and actually had the Release Agreement for four to five weeks before she executed and returned it to the Bank. Id. ¶ 64. Moreover, Pinsky was specifically encouraged by the Bank to consult an attorney regarding the Release Agreement. Id. ¶ 61.

In addition, the consideration given in exchange for Pinsky's entry into the Release Agreement exceeded the benefits to which she already entitled, since Pinsky had no right to any severance benefits absent execution of the Release Agreement. Stmt. ¶ 60.

Finally, the Bank submits that the language of the Release Agreement makes clear that one of the effects of execution of the Agreement is to release all claims that an employee of the Bank may have against the Bank through the date of execution of the Agreement. Moreover, by executing the Agreement, Plaintiff acknowledged that she had read the Agreement, had been advised to discuss the Agreement with an attorney, understood the terms and effects of the Agreement, and executed it knowingly and voluntarily. See Ex. "25" p. 5.

Thus, Plaintiff's release of her ADA claim was knowing and voluntary.

### 2.    PLAINTIFF'S STATE LAW CLAIMS.

For purposes of determining the enforceability of the Release Agreement, Pinsky's state law claims, even though statutory, are subject to New York contract law. Thus, in Cordoba, 2003 WL 22902266 *6, the Court held that "[t]he enforceability of the Release as to Cordoba's NYSHRL and NYCHRL claims ... is governed by ordinary contract law principles."

As such, "[u]nder New York contract law, a valid release that is clear and unambiguous on its face, even one relinquishing a discrimination claim, is enforceable so long as the release has been knowingly and voluntarily entered into." Cordoba, 2003 WL 22902266 *6; Pampillonia v. RJR Nabisco, Inc., 138 F.3d 459, 463 (2nd Cir. 1998); Simel v. JP Morgan Chase, 05 Civ. 9750 (GBD), 2007 WL 809689 (S.D.N.Y. Mar. 19, 2007); Skluth v. United Merchants & Manufacturers, Inc., 163 A.D.2d 104, 106, 559 N.Y.S.2d 280, 282 (1st Dep't 1990). The enforceability of a release does not depend on whether the releasor was subjectively aware of the precise claims to which the release pertains when executing the release. Clark v. Buffalo Wire Works Co., Inc., 3 F. Supp.2d 366, 373 (W.D.N.Y. 1998); Mergler v. Crystal Properties Assoc., Ltd., 179 A.D.2d 177, 583 N.Y.S.2d 229, 232 (1st Dep't 1992). Moreover, a release will not be "treated lightly, and will be set aside by a court only for duress, illegality, fraud or mutual

mistake." See Cramer v. Newburgh Molded Products, Inc., 228 A.D.2d 541, 541, 645 N.Y.S.2d 46 (2nd Dep't), lv. den., 89 N.Y.2d 803, 653 N.Y.S.2d 280 (1996).

Finally, "it is well settled that the totality-of-the-circumstances standard is stricter than ordinary contract law principles for determining whether a release is knowing and voluntary.... Because Cordoba's waiver of her Title VII claims was knowing and voluntary under the totality-of-the-circumstances standard, ... and Cordoba does not raise any novel arguments concerning the Release's enforceability as to her NYSHRL and NYCHRL causes of action, BDA is entitled to summary judgment dismissing all of Cordoba's NYSHRL and NYCHRL causes of action." Cordoba, 2003 WL 22902266 *6; Bormann v. AT & T Communications, Inc., 875 F.2d 399, 402 (2nd Cir.), cert. denied, 493 U.S. 924 (1989). Thus, since the Release Agreement was knowing and voluntary under federal law, it also was knowing and voluntary under New York law.

Because Pinsky has plainly released any and all claims she may have had against the Bank, her claims, her Amended Complaint and her action should be dismissed.

### III

### THE UNDISPUTED FACTS ESTABLISH THAT PINSKY'S FAILURE TO ACCOMMODATE CLAIMS ARE WITHOUT MERIT AND SHOULD BE DISMISSED

Pinsky's claims that the Bank failed to provide an accommodation for her alleged disability under the ADA, the NYSHRL, and the NYCHRL are wholly without merit. Pinsky's claims must be dismissed because the undisputed facts establish that the Bank did provide Pinsky with an accommodation for her back condition and that the accommodation provided was "reasonable".

"In order to establish a prima facie claim of disability discrimination under the ADA for failure to provide reasonable accommodation, a plaintiff must establish that: (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute

18

had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." Rodal v. Anesthesia Group of Onandago, PC, 369 F.3d 113, 118 (2nd Cir. 2004); Constance v. Pepsi Bottling Co. of New York, CV 03-5009 (CBA), 2007 WL 2460688 *31 (E.D.N.Y. Aug. 24, 2007); EEOC v. Yellow Freight System, Inc., 98 Civ. 2270 (THK), 2002 WL 31011859 *11 (S.D.N.Y. Sept. 9, 2002). Since an employer subject to New York's Human Rights Law also is required to "provide reasonable accommodation to the known disabilities of an employee in connection with a job or occupation sought or held." Executive Law, § 296(3)(a), as is an employer subject to New York City's Human Rights Law, Administrative Code, § 8-107(15)(a); see also Pimentel v. Citibank, N.A., 29 A.D.2d 141, 811 N.Y.S.2d 381 (1st Dep't), lv. den., 7 N.Y.3d 707, 821 N.Y.S.2d 813 (2006), and because "[c]laims for disability discrimination arising under the NYSHRL and the NYCHRL are governed by the same legal standards as federal ADA claims." Hartnett v. Fielding Graduate Inst., 400 F. Supp.2d 570, 581 (S.D.N.Y. 2005), aff'd, 198 Fed. Appx. 89 (2nd Cir. 2006); Rodal, 369 F.3d 113, 117 n. 1, all of Pinsky's claims are subject to the requirement that she be able to prove that the Bank refused to provide her with a "reasonable accommodation". Pinsky cannot meet her burden for these claims because the undisputed facts establish that the Bank provided her with such an accommodation.

The law is clear that "[t]he defendant is not required to provide any particular accommodation plaintiff requested, 'only some accommodation, as long as it was reasonable.'" Williams v. British Airways, PLC, 04-CV-0471 (CPS), 06-CV-5085 (CPS), 2007 WL 2907426 *9 (E.D.N.Y. Sept. 27, 2007) (citation omitted); EEOC, 2002 WL 31011859 *21; Felix v. New York City Transit Auth., 154 F. Supp.2d 640, 655 (S.D.N.Y. 2001), aff'd, 324 F.3d 102 (2nd Cir.

2003). Thus, an employer can comply with the statutory requirements by providing an accommodation other than that specifically requested by the employee, or recommended by the health care provider, so long as that accommodation itself is reasonable.

The mere fact that an employer "could have provided a different set of reasonable accommodations or more accommodations does not establish that the accommodations provided were unreasonable or that additional accommodations were necessary." Wynne v. Tufts Univ. School of Medicine, No. 99-1105-Z, 1992 WL 46077 at *1 (D. Mass. Mar. 2, 1992), aff'd, 976 F.2d 791 (1st Cir. 1992), cert. denied, 507 U.S. 1030, 113 S. Ct. 1845 (1993)); Francis v. Runyon, 928 F. Supp. 195, 206 (E.D.N.Y. 1996); Misek-Falkoff v. IBM Corp., 854 F. Supp. 215, 228 (S.D.N.Y. 1994), aff'd, 60 F.3d 811 (2nd Cir.), cert. denied, 516 U.S. 991, 116 S. Ct. 522 (1995) (citation omitted).

In this case, Pinsky's chiropractor noted that she had "lower back pain and muscle spasm, secondary to an Acute Strain/Sprain Syndrome of the Lumbosacral Spine and pelvis", should "refrain from extended periods of sitting (not to exceed 20 to 30 minutes)", and "would benefit from the use of a 'standing desk', to avoid having to sit while working for more than the recommended time frame". Rule 56.1 Stmt. ¶ 19. By letting Pinsky use the second Customer Service Desk in the Water Street branch, which permitted her to work both while standing, id. ¶ 39-41, 44, and 45, The Bank provided her with an accommodation that specifically addressed what was requested, i.e., enabling her to work while standing, so that she would not have to sit for extended periods.

Thus, "plaintiff's inability to establish that defendants failed to provide reasonable accommodations is fatal to [her] claims under the NYSHRL and the NYCHRL as well as the ADA." Constance, 2007 WL 2460688 *34 (citation omitted).

**IV**

**THE UNDISPUTED FACTS ESTABLISH THAT PINSKY VIOLATED JPMORGAN CHASE'S CODE OF CONDUCT WHEN SHE PERFORMED SERVICES FOR, ACTED AS AN OFFICER OF, AND INVESTED IN TRI-STATE BIODIESEL WHILE STILL A BANK EMPLOYEE**

During the course of her disability leave, Pinsky violated JPMorgan Chase & Co.'s Code of Conduct by acting as an officer of another business, and investing in that business, without even attempting to pre-clear those activities with JPMorgan Chase. Moreover, she and that other business explicitly attempted to trade on JPMorgan Chase's name and reputation in an attempt to build up their own business. All of these actions constituted a breach of the terms and conditions of Pinsky's employment with the Bank and, because they took place when Pinsky was on a full disability leave from the Bank, also constituted a fraud against the Bank and unjustly enriched Pinsky. The Bank's motion should be granted, Pinsky found liable to the Bank for these actions, and the matter set down for a determination of damages.

JPMorgan Chase & Co.'s firm-wide Code of Conduct applies to all JPMorgan Chase employees, including those on disability leaves. Stmt. ¶¶ 92, 93. Pinsky herself understood that she was still an employee of JPMorgan Chase, even while on disability leave. Id. ¶ 94. The provisions of the Code, which explicitly mandates that compliance with it is a term and condition of employment by JPMorgan Chase, can be reviewed by employees by going to the Firm's intranet website. Id. ¶¶ 95, 96.

In order to, inter alia, avoid conflicts of interest, appearances of impropriety, and protect JPMorgan Chase's name, brands, reputation, etc., the Code of Conduct requires that employees pre-clear all outside business activities for which the individual is paid, any affiliation with another business as a "director, officer, advisory board member, general partner, owner,

consultant, holder of 5% or more of the business' voting equity interests, or in any similar position." Stmt. ¶¶ 97, 98, 99.

An important aspect of compliance with the Code of Conduct is the requirement that all JPMorgan Chase employees affirm that have read, understood, and are in compliance with, the Code of Conduct on a recurring basis. Stmt. ¶ 100. Pinsky submitted her affirmances on three separate occasions, stating that she "read, under[stood], and am in compliance with the" Code of Conduct, on December 18, 2002, October 21, 2003, and March 3, 2005. Id. ¶ 101. Pinsky, however, had a casual attitude towards the Code, as shown by her testimony that she was not familiar with, and did not understand, many of its requirements. Id. ¶ 102.

Perhaps due to this casual attitude towards her employer, after this lawsuit was commenced, JPMorgan Chase learned that Pinsky was a member of the "[Tri-State Biodiesel] Team". Tri-State's webpage for Ms Pinsky read as follows: "Susan Pinsky, Chief Administration Officer - Susan recently left her position as an Assistant Treasurer at JP Morgan Chase to join the Tri-State Biodiesel team.... Her expertise in management and her leadership skills have made her the perfect fit to build the corporate structure of our company. She currently manages all the City and State Licensing, the Company registrations and the financials." Stmt. ¶ 104.

Even after, the Bank filed its counter-claims against Pinsky, the only change to Tri-State's website was to delete the reference to JPMorgan Chase. Stmt. ¶ 105. Otherwise, Tri-State's description of Plaintiff's relationship to it remained the same. Id.

At her deposition, Pinsky testified that she helped "build the corporate structure of the company of Tri-State Biodiesel", and completed paperwork for, and managed, "monthly or quarterly reports" and "all the City and State licensing companies, registration and the financials." Stmt. ¶ 106. In addition, when Pinsky executed her Subscription Agreement with

Tri-State Biodiesel LLC, to invest in that firm, she signed that Agreement in her own handwriting stating that her title was "Chief Administration Officer". Id. ¶ 108. Later in the deposition, Pinsky also testified that she was Tri-State's corporate secretary and an officer of the company. Id. ¶ 109. Finally, Pinsky admits that she is an Plaintiff was and is an investor in Tri-State. Id. ¶ 107.

JPMorgan Chase's records reflect, and Pinsky admits, that she never received any pre-clearance from JPMorgan Chase regarding her relationship with Tri-State. Stmt. ¶ 110, 111.

Accordingly, the undisputed facts demonstrate that, through her relationship with Tri-State, Pinsky breached the terms and conditions of her employment with JPMorgan Chase. In addition, the undisputed facts demonstrate that Pinsky's performance of services for Tri-State while was on a full disability leave from the Bank constituted a fraud relating to her claim of disability. Finally, the undisputed facts also show since Pinsky still was receiving employee benefits such as medical, dental, and vision insurance through JPMorgan Chase's benefit plans, when she otherwise would have been subject to termination because of her breach of the Code of Conduct and her fraudulent conduct, she was unjustly enriched in receiving such benefits at the employee rate. Defendant's motion for summary judgment as to Pinsky's liability on its counter-claims should be granted.

## CONCLUSION

For all of the above reasons, the Court should grant Defendant's motion for summary judgment, dismiss all of Plaintiff's claims and this action, and find in favor of Defendants on its counter-claims.

Dated:  March 31, 2008

JPMORGAN CHASE LEGAL AND
COMPLIANCE DEPARTMENT

By: _____
        Frederic L. Lieberman
Attorneys for Defendant
One Chase Manhattan Plaza, Floor 26
New York, New York 10081
(212) 552-1815
frederic.l.lieberman@jpmchase.com