**PINSKY**  1

1                    Pinsky

2         A.    Yes, February '04.

3         Q.    What happened in February '04?

4         A.    I was promoted to a megabranch.

5         Q.    Which megabranch were you promoted

6    to?

7         A.    55 Water Street.

8         Q.    When you stay say a megabranch,

9    what was your understanding of that term?

10        A.    One of the largest branches in the

11   city.

12        Q.    Large by terms of what

13   characteristic?

14        A.    Mainly money and clients in the

15   bank.

16        Q.    How long did you remain at that

17   branch?

18        A.    Until June.

19        Q.    Of which year?

20        A.    2004.  Would that be '04 or would

21   that be '05?  '05, excuse me, June '05.

22        Q.    So a little less than a year and a

23   half at that branch, February '04 to June '05?

24        A.    No, it was only a few months.  It

25   had to have been February '05 to June '05,

**PINSKY**  2

Susan Pinsky

```
 1                       Pinsky
 2         Q.    Are you familiar with the JPMorgan
 3    Chase code of conduct?
 4         A.    A bit.
 5         Q.    Have you ever read it?
 6         A.    I may have, not certain.
 7         Q.    Are you familiar with any of its
 8    provisions?
 9         A.    I'm not sure.
10         Q.    Okay.
11         A.    I'm sorry, can I break for a
12    second?
13         Q.    You may.
14         A.    Thank you.
15         Q.    You're welcome.
16              MR. LIEBERMAN:  Off the record.
17              (Whereupon, an off-the-record
18         discussion was held.)
19              (Time noted:  11:16 a.m.)
20              (Time noted:  11:18 a.m.)
21              MR. LIEBERMAN:  Read the last
22         question and answer back, please.
23              (Record read.)
24         Q.    Are you familiar with any of the
25    code of conduct's provisions regarding working
```

Susan Pinsky

Page 38

```
 1                    Pinsky
 2    for other companies?
 3         A.    I became so after I was sued.
 4         Q.    In this lawsuit?
 5         A.    In this lawsuit.
 6         Q.    Okay.
 7               Are you familiar with any of the
 8    code of conduct provisions regarding
 9    investments in other companies?
10         A.    No.
11         Q.    Are you familiar with any of the
12    code of conduct's provisions regarding being
13    an officer of another company?
14         A.    I was made aware of that after I
15    was sued by Chase.
16         Q.    In this lawsuit?
17         A.    In this lawsuit.
18         Q.    Did you ever affirm the code of
19    conduct?
20         A.    What does that mean?
21         Q.    Did you ever acknowledge that you
22    had read it and understood its obligations and
23    agreed to abide by them?
24         A.    I signed off on it.
25         Q.    Okay.
```

**PINSKY 3**

1                        Pinsky

2    employment.  I would ask you to look at those

3    provisions and let me know when you have done

4    so.

5         A.    Okay.

6         Q.    Thank you.

7               MR. SCHWARTZ:  I'm going to take a

8         break while she's reading.

9               Off the record.

10              (Whereupon, an off-the-record

11        discussion was held.)

12              (Time noted:  11:22 a.m.)

13              (Time noted:  11:34 a.m.)

14        Q.    Back on the record.

15              Have you had a chance to look over

16   Defendant's Exhibit 2, Ms. Pinsky?

17        A.    Yes.

18        Q.    And having now looked over the

19   section 6.3 whose title I gave before, Outside

20   Business and Not-For-Profit Activities Outside

21   Employment, do you have any greater

22   recollection of being familiar with those

23   provisions during your employment with Chase?

24        A.    Only when Arthur told me about

25   them.

Susan Pinsky

```
 1                    Pinsky

 2         Q.    Okay, thank you.

 3              I had also asked you whether you

 4    had ever affirmed the code of conduct and you

 5    had indicated that you had acknowledged it I

 6    think in some way, I'm not sure if that was

 7    your word.

 8         .A.    I think I may have scanned over it

 9    but I never read it from front to back.

10              MR. LIEBERMAN:  If you can mark

11         this as Defendant's Exhibit 3, for

12         identification.

13              (Defendant's Exhibit 3, affirmation

14         form, marked for identification, as of

15         this date.)

16         Q.    Ms. Pinsky, I'm showing you what

17    was marked Defendant's Exhibit 3, for

18    identification.  I ask you do you recall ever

19    seeing this before?

20         A.    I don't remember it.

21         Q.    You don't remember it.

22              Down almost all the way at the

23    bottom on the left side above the line with

24    the word signature there is some handwriting.

25              Is that your signature?
```

Susan Pinsky

Page 42

```
 1                    Pinsky
 2        A.    Yes, it is.
 3        Q.    Okay.
 4              Do you remember signing this
 5   document?
 6        A.    No.
 7        Q.    In the middle of that page where
 8   it has the GID number --
 9        A.    Yes.
10        Q.    -- can you read that number?
11        A.    U474707.
12        Q.    Was that your employee
13   identification number called a GID number?
14        A.    Yes.
15        Q.    Okay.
16              What is the date on this document?
17        A.    12/18/02.
18        Q.    Looking at the first paragraph of
19   this document, do you see where it says, "I
20   hereby affirm that I have read, understand and
21   am in compliance with the provisions of
22   JPMorgan Chase Worldwide rules of conduct?"
23        A.    Yes.
24        Q.    Thank you.
25              At the time that you signed this
```

Susan Pinsky

Page 43

1                           Pinsky

2       had you in fact read the JPMorgan Chase

3       Worldwide rules of conduct?

4            A.    Not to my recollection.

5            Q.    At the time that you signed this

6       did you understand the JPMorgan Chase

7       Worldwide rules of conduct?

8            A.    No.

9            Q.    At any time after December 18th,

10      2002 did you again affirm what was either

11      known as the worldwide rules of conduct or

12      what is now known as the code of conduct?

13           A.    I don't recall.

14                 MR. LIEBERMAN:  If you would mark

15           this one as Defendant's Exhibit 4, for

16           identification, please.

17                 (Defendant's Exhibit 4, screen shot

18           and affirmation form, marked for

19           identification, as of this date.)

20           Q.    On the first page of this document

21      in the box that appears in the page three

22      lines from the bottom, do you see the words

23      ECA number?

24           A.    Yes.

25           Q.    Is the ECA number that is printed

**PINSKY 4**

Susan Pinsky

Page 46

```
 1                      Pinsky

 2        A.    All I can say is it is possible it

 3   happened around --

 4        Q.    Okay, fair enough.

 5              Do you know whether that merger of

 6   JPMorgan Chase and Bank One had any affect on

 7   the employment status of the home equity loan

 8   officers such as yourself?

 9        A.    I don't understand the question,

10   I'm sorry.

11        Q.    After that merger went into

12   effect, did the new firm determine that it did

13   not need to have as many home equity loan

14   officers as it had before?

15        A.    At the time it went into effect, I

16   don't recall, I don't think so because I'm

17   trying to think of when I remember getting the

18   notice of like, you know, your position is

19   ending kind of thing, and I could have sworn

20   it was after like, well after the merger, not

21   like they merged a week later we found out, it

22   wasn't like that I can tell you.

23        Q.    When is the first time that you

24   learned that home equity loan officer

25   positions were going to be eliminated, not
```

Susan Pinsky

1                    Pinsky

2    yours necessarily but positions in general?

3         A.    I believe it was right before I

4    was promoted to 55 Water.

5         Q.    What's the time frame, to the best

6    your knowledge that you put on that promotion?

7         A.    February.

8         Q.    Of 2005?

9         A.    Yes.

10        Q.    At that time what did you hear?

11        A.    I'm sorry, I don't recall exactly.

12   I remember I knew at that point that my

13   division was going to be eliminated.

14        Q.    When you say your division, what

15   do you mean?

16        A.    Home equity loan officers.

17        Q.    All of them, there would be none

18   left?

19        A.    It was changing into, technically

20   yes, that was over but there would be other

21   positions that I don't remember, I think they

22   maybe had some working out of their own homes

23   something like that, some of those positions

24   would remain, I don't remember, I'm sorry.

25        Q.    Okay.

**PINSKY 5**

Susan Pinsky

```
 1                     Pinsky
 2    help us find a new job and that we would get
 3    some compensation.
 4         Q.    Okay.
 5              MR. LIEBERMAN:  Can you mark this
 6         as Defendant's Exhibit 6, for
 7         identification.
 8              (Defendant's Exhibit 6, severance
 9         letter, marked for identification, as of
10         this date.)
11              MR. SCHWARTZ:  Can I talk to my
12         lawyer?
13              MR. LIEBERMAN:  You may.
14              Off the record.
15              (Whereupon, an off-the-record
16         discussion was held.)
17              (Time noted:  11:50 a.m.)
18              (Time noted:  11:53 a.m.)
19         Q.    Ms. Pinsky, I'm showing you what's
20    been marked Defendant's Exhibit 6, for
21    identification, and ask you, the one you have
22    right there, and ask you if you have seen this
23    document before?
24         A.    Yes, I have.
25         Q.    Is this the document that you were
```

Susan Pinsky

```
 1                     Pinsky
 2    just referring to?
 3         A.    Yes.
 4         Q.    You see the date of May 20th,
 5    2005?
 6         A.    Yes.
 7         Q.    Is that the date on or about when
 8    you received this document?
 9         A.    No, because I remember I got it
10    late.
11         Q.    How did you get it, by mail or by
12    hand delivery?
13         A.    I believe it was in-house
14    delivery.  We have the system you extend to
15    people through that yellow envelope, if I
16    remember correctly that's how I got it.
17         Q.    You believe you received it
18    sometime within a few days after May 20th?
19         A.    I got it late like five to six,
20    seven days late because I remember telling my
21    HR rep that.
22         Q.    Okay.
23               It is your understanding that
24    Defendant's Exhibit 6 set out the notice to
25    you of the elimination of your position with
```

Susan Pinsky

Page 53

```
 1                    Pinsky
 2   proposed termination of your employment and
 3   what benefits the bank would be paying you
 4   because of that --
 5        A.    Yes.
 6        Q.    -- if you signed the agreement
 7   that you mentioned?
 8        A.    Yes.
 9        Q.    Okay.
10             MR. LIEBERMAN:   This will be
11        Defendant's Exhibit 7, for
12        identification.
13             (Defendant's Exhibit 7, release
14        agreement, marked for identification, as
15        of this date.)
16        Q.    Ms. Pinsky, I'm showing you what
17   is marked Defendant's Exhibit 7, for
18   identification, and I ask you if you have seen
19   this document before.
20        A.    Yes.
21        Q.    If you would look at page five of
22   the exhibit.
23        A.    Sorry, this was one I got a week
24   late, that's right.
25        Q.    Let me ask you this.
```

**PINSKY 6**

Susan Pinsky

1                          Pinsky

2          Q.    About a third of the way down on

3    the right side.

4                MR. SCHWARTZ:   Page five.

5          Q.    Thank you.

6          A.    Yes.

7          Q.    Is that your signature above the

8    typewritten words, Susan Pinsky?

9          A.    It is.

10         Q.    Okay.

11               And did you read this document

12   before you signed it?

13         A.    Yes.

14         Q.    Did you understand the meaning of

15   this document?

16         A.    Pretty much.

17         Q.    Did you consult with any attorney

18   before you signed it?

19         A.    No.

20         Q.    Did you discuss the document with

21   anyone before you signed it?

22         A.    No.

23         Q.    What was your understanding of

24   what you were agreeing to in this release

25   agreement?

Susan Pinsky

1                          Pinsky

2          A.      That I was going to find another

3    job here and continue working here, so I

4    really didn't think much of it.

5                  In fact, I would say going back I

6    understood that the gist of it, again I

7    skimmed it, didn't read it from front to back,

8    but I just didn't think it really applied to

9    me because I thought I was going to continue

10   working here, at the time I had every reason

11   to believe that.

12         Q.      Had anybody offered you a job at

13   that point?

14         A.      Yes.

15         Q.      Who?

16         A.      The branch manager of the branch I

17   was working at.

18         Q.      Who was that?

19         A.      That was Keith Swanson.

20         Q.      What job did he offer you?

21         A.      A banker position that specialized

22   in home equity.

23         Q.      Working at which branch?

24         A.      That branch, 55 Water.

25         Q.      Do you recall when he offered that

**PINSKY 7**

Susan Pinsky

1                          Pinsky

2    knew about it before I got actually moved from

3    the 28th Street and Park Avenue to 55 Water.

4          Q.    Okay.

5                MR. SCHWARTZ:  Is there is a

6          question?

7                MR. LIEBERMAN:  She was reading the

8          document, I let people who like to read

9          things, read away.

10         A.    Oh, I'm sorry --

11               MR. SCHWARTZ:  There is no

12         question.

13         A.    I thought it was weird.  It says

14   Sue, this was never from me because I never

15   write Sue, and then I realized it wasn't from

16   me, it was from Susan Anderson.

17         Q.    Did there come a time when you

18   went out on disability leave from your

19   employment at JPMorgan Chase?

20         A.    Yes.

21         Q.    When was that?

22         A.    June.

23         Q.    Of what year?

24         A.    '05.

25         Q.    What was your disability at that

**PINSKY 8**

Susan Pinsky

1                    Pinsky

2    disability?

3         A.    I did.

4         Q.    When was that?

5         A.    My long-term disability went into

6    effect the middle of December.

7         Q.    Of 2005?

8         A.    Yes.

9         Q.    What is the rate of your long-term

10   disability benefit?

11        A.    Two years.

12        Q.    No, no --

13        A.    I think it comes out to 75 a year.

14        Q.    What rate, what monetary rate were

15   you receiving the LTD benefits?

16        A.    60 percent of my total of the

17   average of the two years of my total comp my

18   past two years.

19        Q.    Do you recall what your total comp

20   was in the two years before they would look

21   at --

22        A.    I remember I made like over 80,000

23   the first year and then I made over 80,000 in

24   six months of the following year.  That was

25   the difference between a regular branch and a

**PINSKY 9**

Page 83

```
 1                      Pinsky
 2   Hartford call me and apologized afterwards.
 3   The woman that was working with me before,
 4   Jennifer Sauerhoff, she called to apologize,
 5   "Susan, I'm so sorry, we didn't know."  And in
 6   fact there had been a letter from Dr. Nestor
 7   saying I should not return to work until I had
 8   my foot surgery done and not before September,
 9   and they had never received that letter and I
10   got them a copy of that letter.
11            But once the, apparently once they
12   say you are no longer on it, they cancel it,
13   it has to go to appeal, they can't just
14   reverse it, it has to go through the entire
15   appeal to be appealed.
16       Q.    Okay.
17            MR. LIEBERMAN:  Mark that as
18       Defendant's Exhibit 9, for
19       identification.
20            (Defendant's Exhibit 9, letter,
21       marked for identification, as of this
22       date.)
23       Q.    Ms. Pinsky, I am showing you what
24   has been marked Defendant's Exhibit 9, for
25   identification.  I ask if you have ever seen
```

Susan Pinsky

Page 84

1                        Pinsky

2    this letter before.

3         A.    Yes.

4         Q.    And is this the letter that you

5    were referring to as the misinformation from

6    Dr. Nestor?

7         A.    This is the letter they never got,

8    that Hartford never got.

9         Q.    This is letter they never got?

10        A.    Until I found out they didn't have

11   it, I sent it after the case.  But this letter

12   was supposed to get to Hartford as a part of

13   his evaluation of me and they did not receive

14   this at the time.  The misinformation part I'm

15   referring to is an annual evaluation which I

16   do not have that they sent to him, he filled

17   out and sent back.

18        Q.    So it wasn't a letter that --

19        A.    No, it was an evaluation form,

20   sorry.

21        Q.    So this is his correcting letter?

22        A.    This was a letter that was written

23   before, you know, or at the same time as the

24   evaluation.  It wasn't like an after the fact

25   kind of letter.

Susan Pinsky

Page 85

```
 1                    Pinsky
 2        Q.    Okay.
 3        A.    I would say around the same time
 4   or before he did the evaluation.
 5        Q.    Did Dr. Nestor give you a copy of
 6   this letter?
 7        A.    Yes.
 8        Q.    This letter says that you're
 9   cleared to return to work, does it not?
10        A.    On September.
11        Q.    On September 1st, 2007?
12        A.    It says that, I'm sorry, yes, it
13   does.
14        Q.    What did you do when you received
15   this letter with it?
16        A.    I gave a copy to Arthur.
17        Q.    Okay.
18              Did you do anything else with it?
19        A.    Yes, I went to see a podiatrist
20   at some point.  What else did I do with it, I
21   did nothing at the first.  I think I may have
22   sent a copy to ALLSUP.  They are the company
23   that was hired by Hartford to try to obtain
24   social security benefits for me because the
25   money would go back to Hartford.  I may have
```



**PINSKY 10**

Susan Pinsky

1                        Pinsky

2    JPMorgan was free to terminate your employment

3    at any time?

4         A.    No, I do not, I don't remember

5    reading that, it has been a long time.

6         Q.    Okay.

7               Did anyone ever tell you that your

8    employment could only be terminated for cause?

9         A.    I have no recollection of that.

10        Q.    Okay.

11              Did there come a time when you

12   were employed by Tri-State Biodiesel, LLC?

13        A.    Employed?

14        Q.    Yes.

15        A.    No.

16        Q.    What was then the nature of your

17   relationship with that company?

18        A.    I'm an investor in that company.

19        Q.    When did you first invest in

20   Tri-State?

21        A.    I think it was like November,

22   December of last year.

23        Q.    Of 2006?

24        A.    Yes.

25        Q.    What was the extent of your

Susan Pinsky

Page 110

```
 1                    Pinsky
 2   investment relationship with Tri-State?
 3        A.    I don't understand the question,
 4   I'm sorry.
 5        Q.    How much of an investor are you in
 6   the company?
 7        A.    $25,000, I bought half a point of
 8   equity.
 9        Q.    How did you come to be involved
10   with Tri-State?
11        A.    I knew the founder of the company
12   for like four years.
13        Q.    That's Brent Baker?
14        A.    Yes.
15        Q.    Other than the investor relation-
16   ship, do you have any other relationship with
17   Tri-State?
18        A.    Friendship.
19        Q.    Okay.
20              Anything else?
21        A.    At this time, no.
22        Q.    In November or December 2006 when
23   you were on long-term disability, was it your
24   understanding that you were still an employee
25   of JPMorgan Chase?
```

Susan Pinsky

1                        Pinsky

2        A.    Yes.

3        Q.    Okay.

4              MR. LIEBERMAN:   If we can mark this

5        as Defendant's Exhibit 14, for

6        identification.

7              (Defendant's Exhibit 14, business

8        plan, marked for identification, as of

9        this date.)

10       Q.    Ms. Pinsky, I am showing you what

11   has been marked Defendant's Exhibit 14, for

12   identification.

13             Have you ever seen this document

14   before?

15       A.    I have seen pieces of it.

16       Q.    Okay.

17             Which pieces have you seen?

18       A.    I'm familiar with all of the

19   information.

20       Q.    But not necessarily in one place?

21       A.    Exactly, not in this order.

22       Q.    Okay.

23             If you would turn to the third

24   page, second page from the back, about a

25   quarter of way down you see in capital letters

**PINSKY 11**

Susan Pinsky

Page 113

1                          Pinsky

2              Was that correct?

3         A.    That it says that or that I left

4    my position?

5         Q.    That you left your position?

6         A.    No, that's not correct.

7         Q.    How did that inaccurate statement

8    get into that paragraph if you were involved

9    with drafting it?

10        A.    Well, because the intention of

11   this was to legitimate the company, it was

12   more for publicity and for web and for

13   investors and things like that so the company

14   would look like it was stronger and had more

15   of a backbone because it was a brand new

16   company and that's why this was written.  They

17   also needed to fill an officer position, I

18   believe, for incorporation reasons.

19        Q.    What position were you described

20   as being an officer?

21        A.     That I was on the documentation, I

22   think corporate secretary.

23        Q.    What is does it say here?

24        A.    It says chief administration

25   officer, but that's not in any of the bylaws

**PINSKY 12**

Susan Pinsky

1                        Pinsky

2    or the incorporation of the company.  I don't

3    believe that's included anywhere, the only

4    thing it says in there is corporate secretary,

5    keeper of the seal.

6         Q.    The corporate secretary is the

7    keeper of the seal?

8         A.    Yeah, that's these old laws,

9    keeper of the seal, the corporate seal.

10        Q.    In the fourth and fifth line down

11   of the document, Exhibit 14 indicates that

12   your expertise in management and leadership

13   skills have made you the perfect fit to build

14   the corporate structure of the company of

15   Tri-State Biodiesel.

16              Was it Tri-State's intent that you

17   do that for it?

18        A.    That I helped, yes, as much as I

19   could.

20        Q.    Was there anyone else who was

21   involved in building the corporate structure

22   of the company?

23        A.    Sure.

24        Q.    Who else?

25        A.    Brent Baker.

Susan Pinsky

1                          Pinsky

2              In fact, I would say he did most

3    of the building of the corporate structure.

4         Q.    The paragraph also says that you

5    currently manage all the City and State

6    licensing companies, registration and the

7    financials.

8              Was that an accurate statement?

9         A.    For one point of time I helped out

10   in this area, yes.

11        Q.    And when you say at one point of

12   time, what does that mean?

13        A.    For, I really, I filled out the

14   paperwork to help get them, and then I filled

15   out the paperwork to like the monthly or

16   quarterly reports on them for several months.

17        Q.    Do you know who this business plan

18   was being given to or shown to?

19        A.    Some people.

20        Q.    Potential investors or --

21        A.    That's it, potential investors,

22   yes.

23        Q.    And what about companies with

24   which Tri-State wanted to do business?

25        A.    What business?

**PINSKY 13**

Susan Pinsky

1                          Pinsky

2    subscription agreement that you signed?

3         A.    Not the last one.

4               He made several changes along the

5    way when new investors came in.  I remember

6    signing a document, the last page, I'm still

7    waiting to receive my copy which I never got.

8         Q.    Have you paid your investment in?

9         A.    My money went in, yes.

10        Q.    All right.

11              Let me ask you this question.

12   Turning to the page that's numbered eight on

13   Defendant's Exhibit 15.

14        A.    My pages aren't numbered.  Here we

15   go, yes.

16              MR. SCHWARTZ:  Can I note for the

17         record that before page eight there is

18         only six pages.

19              MR. LIEBERMAN:  You can certainly

20         note that.  We can also note that those

21         aren't numbered, that page is the only

22         one that has the number on it.  I don't

23         disagree with you on that.

24        Q.    Looking at this page that's

25   numbered eight but not necessarily the eighth

Susan Pinsky

1                        Pinsky

2    page of this document, do you see where it

3    says name, Susan Pinsky?

4         A.    Yes.

5         Q.    Is that your signature above it?

6         A.    It is.

7         Q.    And where it is handwritten chief

8    administration officer, who wrote that?

9         A.    I did.

10        Q.    Okay.

11              Was that your address at the time?

12        A.    Yes, it was a temporary address.

13        Q.    The tax identification number, is

14   your social security number there?

15        A.    Yes, it is.

16        Q.    Okay.

17              Turning to the last two pages,

18   I'll call it Exhibit A and Exhibit B, do you

19   see where it indicates for the number of

20   shares that for you, you were allocated 5.4913

21   class B membership interests or class B units?

22        A.    Yes.

23        Q.    Do you recall if that seems

24   accurate to you as to what you were receiving

25   for your investment?