**PINSKY 14**

Susan Pinsky

1                       Pinsky

2          Q.     You have already testified that

3     the factory hasn't been built but Tri-State

4     Biodiesel as a company exists.

5                 Isn't that correct?

6          A.     Tri-State Biodiesel as a company

7     exists but its not doing the business its

8     meant to do, if you understand.

9          Q.     Right now?

10         A.     It has been started, it is in

11    existence and they are building certain parts

12    of it which will eventually feed into the

13    factory, yes, but it makes no money.  I'm not

14    saying it doesn't bring any money in, it does,

15    the burn right now from what I understand is

16    35,000 a month, and they are not making 35,000

17    a month.

18         Q.     Tri-State has a web site; isn't

19    that correct?

20         A.     Yes, it does.

21         Q.     And on the web site did it list

22    its management team?

23         A.     It did.

24         Q.     Were you listed as one of those

25    people?

Susan Pinsky

```
 1                         Pinsky
 2        A.    I was.
 3        Q.    When was that?
 4        A.    I think from December until I was
 5   taken off, which would have been July or so.
 6        Q.    From December '06?
 7        A.    Yes.
 8        Q.    Why were you taken off?
 9        A.    Because you countersued me.
10             And Brent was afraid that it would
11   harm the company, so I was taken off the web
12   site and my officer position of being
13   corporate secretary was taken away also, and I
14   was no longer an officer of the company.
15             MR. LIEBERMAN:  Can you read back
16        the answer.
17             (Record read.)
18        Q.    What was it that Mr. Baker was
19   afraid would harm the company?
20        A.    His reputation, the reputation of
21   the company.  He was afraid he would get
22   pulled into a lawsuit.  Tri-State has gotten a
23   lot of really good public press, it really has
24   for a company that doesn't exist, that's not
25   up and operating.  I mean, supposedly we have
```

**PINSKY 15**

1                           Pinsky

2     Tri-State Biodiesel web site?

3          A.    I would say December maybe

4     November, but I think December to July.

5                MR. LIEBERMAN:   Mark this as

6          Defendant's Exhibit 17, for

7          identification.

8                (Defendant's Exhibit 17, bio,

9          marked for identification, as of this

10         date.)

11         Q.    Ms. Pinsky, directing your

12    attention to Defendant's Exhibit 17, for

13    identification.

14               Have you seen this version of the

15    description of you on the Tri-State Biodiesel

16    web site?

17         A.    Yes.

18         Q.    Can you tell me how Defendant's

19    Exhibit 17 differs from Defendant's Exhibit

20    16?

21         A.    Yes.

22         Q.    How is that?

23         A.    16 says I recently left my

24    position as assistant treasurer at JPMorgan

25    Chase, and the second one leaves that part

Susan Pinsky

Page 129

```
 1                    Pinsky
 2   out.
 3       Q.   Are there any other differences
 4   between the two versions?
 5       A.   The first one says 10 years in
 6   experience specializing, the other one
 7   basically says the same thing but leave, no,
 8   it says 10 years corporate relationship
 9   management, I believe its the same thing its
10   just kind of written out differently.
11       Q.   Would it be fair to say that
12   Defendant's Exhibit 17 is not attempting to
13   trade on your employment experience at
14   JPMorgan Chase while the first one is?
15       A.   Yes.
16       Q.   Did you ever preclear your
17   investment in Tri-State Biodiesel with the
18   JPMorgan Chase office of the secretary?
19       A.   I did not.
20       Q.   Did you ever preclear your officer
21   position with Tri-State Biodiesel with the
22   JPMorgan Chase office of the secretary?
23       A.   I did not.
24       Q.   Were you aware that you were
25   required to do so by the code of conduct?
```

Susan Pinsky

Page 130

```
 1                    Pinsky
 2        A.    No, I was not.
 3        Q.    Are you affiliated in some way
 4   with an organization called Dance Parade?
 5        A.    I am.
 6        Q.    What is your relationship with
 7   Dance Parade?
 8        A.    I'm the liaison to government
 9   affairs.
10        Q.    What does that mean?
11        A.    That means I try to get people
12   from the government to come to Dance Parade to
13   support it.  I got, I wrote some letters, I
14   got a letter of support from Mr. Spitzer for
15   Dance Parade; that's pretty much it, I went to
16   a few --
17             MR. SCHWARTZ:  You wrote to me.
18        A.    That's right, I got Arthur aboard.
19        Q.    Is Dance Parade a not-for-profit
20   organization?
21        A.    I believe so.
22        Q.    Do you have any employment
23   relationship with it?
24        A.    No, I do not.
25        Q.    Do you have any investor status
```

**PINSKY 16**

Susan Pinsky

Page 148

```
 1                      Pinsky
 2   so I was stuck sitting down.
 3              He said, "You can't sit down, it
 4   is making you worse."  It was obvious, I was
 5   aware of this too, get a standing desk, that
 6   way you can stand and sit, stand and sit and
 7   that way we will take a lot of that pressure
 8   off of that hip, or the back as he thought it
 9   was, but it was really my hip.
10       Q.    At that time did you know what a
11   standing desk was?
12       A.    He explained it to me.
13       Q.    What did he tell you?
14       A.    It was a desk, just a piece of
15   equipment, they come in that they make
16   nowadays for people, its nothing uncommon and
17   you're able to use it because you can put your
18   keyboard like I guess it has shelves where you
19   could stand up and put your keyboard up and
20   your computer above so you can stand and work.
21       Q.    Okay.
22              Is it an adjustable desk?
23       A.    You can stand and you can sit.  I
24   think you can adjust it to your height, I
25   think or when they come they adjust it to your
```

Susan Pinsky

1                       Pinsky

2    height, they put it in but its versatile in

3    that I can put my keyboard up, stand up and

4    work, take my keyboard off and sit down and

5    work, from what I understand; I never actually

6    got to see one.

7         Q.    Okay.

8               After he made this recommendation

9    to you, what did you do?

10        A.    I called Dee Lakhani.  And I said,

11   "My doctor said I need a standing desk."

12        Q.    What did she say to you?

13        A.    She said, "Call Barbara Zimmer,

14   she's the HR rep, she's in charge of that."

15        Q.    What did you do?

16        A.    I called Barbara Zimmer.

17        Q.    Did you have a conversation with

18   her?

19        A.    I did.

20        Q.    What was that conversation?

21        A.    I said, "I need a standing desk,

22   my hip is killing me and this is what my

23   doctor has prescribed."

24        Q.    What did she say?

25        A.    She said, "Absolutely, no problem,

Susan Pinsky

1                        Pinsky

2    get a letter from your doctor and then let me

3    know.  I'll give you the fax number and person

4    to send it to in HR medical."  I said, "Okay."

5             A few days later I followed up, I

6    got the letter.  I called her and I believe

7    she e-mailed me the information or she told me

8    over the phone.  I don't remember now, and I

9    faxed it to the woman we saw last time I was

10   here in HR medical.

11        Q.    Miriam Negron?

12        A.    Miriam Negron.

13        Q.    Do you have any sort of

14   documentation showing that you faxed it to Ms.

15   Negron?

16        A.    I do, I had the cover sheet and

17   the actual fax I faxed her.

18        Q.    When you say the actual fax, what

19   do you mean?

20        A.    Well, my letter, excuse me, the

21   letter from the doctor and the fax cover.

22        Q.    Okay.

23             And do those documents show that

24   it was received?

25        A.    No, they do not.

**PINSKY 17**

Susan Pinsky

Page 156

```
 1                    Pinsky
 2    April 4th, 2005 would that refresh your
 3    recollection as to when you spoke to her for
 4    the first time?
 5         A.    April 4th?
 6         Q.    Yes.
 7         A.    That sounds like it would be
 8    around the right time.
 9         Q.    Okay.
10         A.    It could be.
11         Q.    Then to backtrack a little bit,
12    between February 24th, 2005 and April 4th,
13    2005, did you ever speak to anybody in the
14    medical department?
15         A.    I did not.
16         Q.    Okay.
17              After you refaxed the cover sheet
18    and Dr. Weinberg's letter to Cindy Chan, what
19    happened after that?
20         A.    I received an e-mail that was
21    actually cc'd to me.  It was an e-mail that
22    went directly to my manager, Dee Lakhani, it
23    was cc'd to me and my HR rep, Barbara Zimmer
24    from Cindy Chan saying Susan needs a desk, we
25    received the letter from her doctor, get her
```

Susan Pinsky

Page 157

```
 1                      Pinsky
 2   the desk now.
 3              MR. LIEBERMAN:  Mark this as
 4         Defendant's Exhibit 21, for
 5         identification.
 6              (Defendant's Exhibit 21, e-mail,
 7         marked for identification, as of this
 8         date.)
 9         Q.    Directing your attention to
10   Defendant's Exhibit 21, for identification.
11              Is that the e-mail from Cindy Chan
12   that you were just testifying about?
13         A.    It is.
14         Q.    What happened after you received
15   this e-mail?
16         A.    Nothing, I thought I was getting
17   my desk.
18              Actually another e-mail came
19   through from Dee to Cindy I think that day and
20   cc'g me and her pretending that she didn't
21   know how to order things on our web site.  Dee
22   mind you had been in management for five years
23   at that point, and so Cindy gave her
24   directions on exactly how to order the desk,
25   and then nothing happened.
```

**PINSKY 18**

Susan Pinsky

1                         Pinsky

2    off this hip.  Then by March the back pain

3    started and it continuously got worse and

4    worse until I left.

5         Q.    This customer desk, were you able

6    to stand at it?

7         A.    I could stand at it.

8         Q.    How much time of a workday did you

9    spend standing at it?

10        A.    As much as I could.

11              I remember holding myself up on my

12   forearms, that's the kind of pain I was in

13   literally, my back was killing me at this

14   point.

15        Q.    Was the pain at that point worse

16   when you were standing or when you were

17   sitting?

18        A.    I would say equal.  If I sat down

19   my hip was killing me, if I stood up my back

20   was killing me.

21        Q.    Is that case --

22        A.    Or both, I would say it was worse

23   when I was sitting so I would try to stand,

24   but I would get tired.

25        Q.    Is it your understanding that at a

Susan Pinsky

1                          Pinsky

2    standing desk you would be able to sit and do

3    work?

4          A.    Yes.

5          Q.    What's the basis for your

6    understanding?

7          A.    Because that's the way it works.

8    Its versatile, you can sit and stand.  They

9    put in these additional shelves so that you

10   can take your keyboard and just put it up on

11   the shelf.  There's a thing up here for your

12   mousepad so you can stand up here and work.

13   Or I can sit down and take the keyboard and

14   put it back down on the desk and sit down as a

15   regular desk, so I have the option.

16         Q.    If I understand it, physically

17   there would be one level on one side where you

18   can sit and work and then next to it there is

19   an elevated level?

20         A.    Sort of.

21               Here's my cubicle, here's my

22   regular desk, this I believe stays the same.

23   They implement a piece which I guess has

24   shelves which turn in and out.  So they are in

25   like this, I can sit and work.  If I need to

**NEGRON**   19

Miriam Negron

Page 5

1

2      M I R I A M      N E G R O N, called as a

3           witness, having been duly sworn by a

4           Notary Public, was examined and

5           testified as follows:

6      EXAMINATION BY

7      MR. SCHWARTZ:

8           Q.    Please state your name.

9           A.    Miriam Negron.

10          Q.    Good afternoon.

11          A.    Good afternoon.

12          Q.    My name is Arthur Schwartz.   I

13     represent Ms. Pinsky in a lawsuit and I have

14     some questions I want to ask of you.   If you

15     don't understand something I ask you, please

16     feel free to ask me to clarify.   OK?

17          A.    OK.

18          Q.    What is your present position with

19     JP Morgan Chase?

20          A.    I'm the northeast region manager for

21     health services.

22          Q.    How long have you held that

23     position?

24          A.    Three years.

25          Q.    So you started in '04?

Page 6

```
 1                    Negron
 2         A.    Correct.
 3         Q.    Before that did you have a position
 4    with Chase?
 5         A.    Yes.
 6         Q.    What position was that?
 7         A.    I was unit manager.
 8         Q.    What unit?
 9         A.    270 Park.
10         Q.    That was unit health services
11    manager?
12         A.    Yes.  Yes.
13         Q.    And the unit was at that building?
14         A.    At 270, yes.
15         Q.    How long did you hold that position?
16         A.    Twelve years.
17         Q.    Were you with Chase before that?
18         A.    Yes.
19         Q.    What position did you hold?
20         A.    Staff nurse.
21         Q.    Where did you do that?
22         A.    At 270 Park.
23         Q.    How long did you hold that position?
24         A.    Four years.
25         Q.    Is that your first position with
```

**NEGRON** 20

Miriam Negron

Page 14

1                          Negron

2          Q.   Did you at any step along the way,

3     did you become involved in the process?

4          A.   No.

5               Like creating the policy?

6          Q.   No.   Like assessing somebody's

7     request for an accommodation.

8          A.   I also function as a nurse, so, yes.

9          Q.   You also do that?

10         A.   Yes, I do.

11         Q.   Employees that were seeking

12    accommodations and weren't employed at 270

13    Park or One Chase but maybe at a branch, would

14    they go through your office to seek an

15    accommodation?

16         A.   If they are located within the area

17    that I cover, yes.

18         Q.   And what area do you cover as a

19    nurse?

20         A.   Chase Plaza.

21         Q.   So you work along with the nurses at

22    Chase Plaza as well?

23         A.   As needed.

24               MR. SCHWARTZ:   I'm going to show

25         you -- mark this two-page document as

Miriam Negron

1                    Negron

2        Exhibit 3.  The first is a fax cover

3        sheet dated February 24, 2005 from Susan

4        Pinsky to Miriam Negron, and the second

5        is a letter on the letterhead of a Dr.

6        Steven Weinberg, W-e-i-n-b-e-r-g, dated

7        2/23/2005 addressed To Whom It May

8        Concern.

9             (Plaintiff's Exhibit 3, two-page

10       document, marked for identification, as

11       of this date.)

12       Q.   Would you take a look at these two

13   pages, please.

14            Do you recall seeing this before?

15       A.   Recently?

16       Q.   Recently.  You saw it in preparation

17   for today's deposition?

18       A.   I saw it from her chart, yes.

19       Q.   And this was in her chart?

20       A.   Yes.

21       Q.   Do you actually recall receiving

22   this?

23       A.   No, I do not.

24       Q.   Looking at this, well, did the chart

25   indicate that you did anything with this

**ZIMMER** 21

Barbara Zimmer

1                        Zimmer

2          Q.    And was there a reason why you kept a

3     note on it?

4          A.    Typically if a team member called I

5     kept a note.

6          Q.    All right.  And this note -- the note

7     is dated 2/8/05; is that correct?

8          A.    Correct.

9          Q.    Is this whole page the note from that

10    day?

11         A.    Since there's no other dates, I would

12    assume it is.

13         Q.    All right.  Let's go through that

14    note.  Utilizing these notes, can you recount

15    for us, as best you can, what was said during

16    that discussion?

17         A.    Based on the note, she told me that

18    she was looking for a standing desk.  It looks

19    like I wrote down Merriam's name.  She is --

20    was, to the best of my recollection, Chase

21    medical.

22              I must have told them that they

23    needed a letter from her doctor with what the

24    medical situation was, that it had to be

25    specific.  And that -- I told her to fax it to

Barbara Zimmer

1              Zimmer

2    medical with her GID, which would be her ID

3    number.  That would be my assumption of the

4    conversation.

5       Q.   Okay.  The subsequent notes are from

6    other dates, 7/21 and 7/29/05.

7       A.   Yes.  It looks like whited-out is the

8    date from the first note.  I'm just assuming

9    that because the column is blurred out on my

10   copy.  So I don't know if the first note was

11   from 7/21 and the date of that note.

12      Q.   All right.  Then the third page of

13   the document that you have is another e-mail

14   that you're copied on; isn't that correct, on

15   2/24/05?

16      A.   The chiropractor?

17      Q.   Yes.

18      A.   Okay.

19      Q.   And Ms. Pinsky asked you to send her

20   the fax number to send the letter to?

21      A.   Excuse me?

22      Q.   She asked you to send her the fax

23   number to send those doctors' letters to.  And

24   I think on the next page she sent you a

25   subsequent e-mail saying she found the

**ZIMMER** 22

Barbara Zimmer

Page 21

1                      Zimmer

2        Q.    Okay.  Do you recall hearing anything

3   else about it prior to receiving the e-mail

4   on -- dated 5/18/05 from Ms. Pinsky saying she

5   was going to take a leave of absence on June

6   22nd for surgery?

7        A.    I'm sorry.  What is the question?

8        Q.    The next e-mail that has your name on

9   it --

10       A.    Yes.

11       Q.    -- in the sequence.  It's about a

12  month and a half later, 5/18/05.

13       A.    Yes.

14       Q.    It's two pages later in the package.

15  It's from Ms. Pinsky saying that she'll

16  have -- she's going to be taking a leave of

17  absence on June 22nd for surgery.

18       A.    Yes.

19       Q.    And was going to be out for a minimum

20  of two weeks.

21            Do you recall having any conversation

22  with Ms. Pinsky prior -- between 4/8/05, the

23  date of last e-mail from Ms. Lakhani, and that

24  e-mail a month and a half later about the

25  standing desk matter?

Barbara Zimmer

1                    Zimmer

2        A.    Not that I recall.

3        Q.    All right.  And the next page is

4    another -- subsequent e-mail from Ms. Pinsky

5    about two weeks later, to Ms. Lakhani, with a

6    copy to you saying, "Hi, my back is killing

7    me.  Any word on my standing desk."

8              And then you sent an e-mail to Dee

9    Lakhani.

10       A.    Yes.

11       Q.    And then you sent a response back to

12   Dee Lakhani saying, I thought they were giving

13   her a place in the branch where she can stand;

14   is that correct?

15       A.    That's what the e-mail says.

16       Q.    And -- and the next e-mail you

17   received at 1:48 p.m. from Ms. Lakhani was a

18   response to your question, I thought they were

19   giving her a place in the branch where she

20   could stand; and they said they did; is that

21   correct?

22             Do you recall having any

23   conversations other than the one on the e-mail

24   about this?

25       A.    I don't recall any.

**ZIMMER**   23

Barbara Zimmer

1                        Zimmer

2     receive.

3        Q.   All right.   Now, do you remember

4     anything about the Chase program?

5             MR. LIEBERMAN:   Objection.   Which

6        program?

7        A.   I'd probably get it confused with the

8     ones we have here.

9     BY MR. SCHWARTZ:

10       Q.   Well, the Chase program that applied

11    to Ms. Pinsky; do you have any recollection

12    about it, how it functioned?

13       A.   I recalled that all of the home

14    equity loan officers were released, that's the

15    best of my recollection; that's the entire

16    group was released at the same time.

17       Q.   Do you recall whether you had any

18    understanding of whether or not the releases

19    that individuals were signing in connection

20    with the severance plan went into effect prior

21    to the termination date?

22       A.   I don't remember the details of how

23    that worked.

24       Q.   So you don't recall whether the

25    release became effective as of the termination



**LAKHANI**  24

**Dee Lakhani**

Page 9

```
 1                     Lakhani
 2 one?
 3      A.    Either one, yes.
 4      Q.    All right.
 5            Did she eventually, in 2005 were
 6 you still supervising her?
 7      A.    Yes.
 8      Q.    What was your title at that time?
 9      A.    I don't remember.
10      Q.    Were you doing the same senior
11 lending specialist type of work?
12      A.    Yes.
13      Q.    And was the supervisory
14 responsibility something you did in addition
15 to that?
16      A.    Yes.
17      Q.    How many employees did you
18 supervise?
19      A.    I don't remember the exact number,
20 probably 10.
21      Q.    All right.
22            Where was Ms. Pinsky working in
23 2005, do you recall?
24      A.    55 Water Street.
25      Q.    And where were you working in
```

**LAKHANI**  25

Dee Lakhani

Page 22

```
 1                    Lakhani
 2 giveaways, business cards.
 3        Q.    Was it normally your
 4 responsibility to order equipment like this
 5 for the employees you were supervising?
 6        A.    I don't know, I never did before.
 7        Q.    You had never ordered any
 8 equipment before?
 9        A.    I don't think so.
10        Q.    You don't think so or you don't
11 know?
12        A.    No.
13        Q.    Did you ever order any equipment
14 from ePurchase while you were a supervisor?
15        A.    I don't remember.
16        Q.    Do you recall ever having a
17 conversation at or around that point with Ms.
18 Pinsky concerning this request or this
19 accommodation?
20        A.    Yes.
21        Q.    What do you recall about your
22 conversation?
23        A.    I remember her telling me she
24 needed a standing desk because she was having
25 back pains.  So I called up, I asked her, I
```

Dee Lakhani

Page 23

1                         Lakhani

2  said, "So what do I do?"  She had told me she

3  spoke to HR or something about it, and then I

4  spoke to the branch.  I called the branch to

5  figure out where are we going to put this desk

6  and of course we should let them know.

7             Then the branch suggested to me

8  that there was a customer service desk in the

9  back and I asked Susan to explain to me what a

10  standing desk was.  That might have been my

11  second phone call back to her because the

12  branch told me about the customer service desk

13  which sounded like the standing desk that she

14  was talking about.  And then I went back to

15  her, I said, "Hey, is this okay?"  She said

16  yes and that was our decision.

17        Q.    Do you recall when that

18  conversation was?

19        A.    No.

20        Q.    You don't recall when you had this

21  conversation?

22        A.    No.

23        Q.    Was it all on the telephone?

24        A.    I don't remember.

25        Q.    Well, was it in person or was it

**LAKHANI**  26

Dee Lakhani

Page 24

1                          Lakhani
2 on the phone?
3        A.    I don't remember, it could have
4 been on the phone; it was two years ago.
5        Q.    Do you recall looking at a
6 particular piece of furniture with Ms. Pinsky
7 pointing it out to her saying, "Is this okay?"
8        A.    No.
9        Q.    You don't recall doing it or you
10 didn't do that?
11       A.    I did not look at piece of
12 furniture.  I had asked her if a piece of
13 furniture was okay, the customer service desk
14 in the back.
15       Q.    You asked her if it was okay?
16       A.    If it was okay to use as her
17 standing desk.
18       Q.    You recall exactly saying that,
19 "Is that okay to use as your standing desk?"
20       A.    I don't remember my exact words,
21 it was two years ago, but we did have that
22 conversation, yes.
23       Q.    Ms. Pinsky, did she say, "I have
24 got to go look at it?"
25       A.    I don't remember.

**Dee Lakhani**

Page 25

1                        Lakhani

2        Q.    Or she just said yes?

3        A.    I don't remember, but she

4  eventually said yes or she did say yes.    I

5  don't remember if she looked at it or --

6        Q.    What do you mean she eventually

7  said yes?  Did she say yes to you?

8        A.    Yes.

9        Q.    In a second phone call or in a

10  second conversation?

11        A.    I don't remember.

12        Q.    Did you think that ended the

13  matter?

14        A.    Yes.

15        Q.    So you didn't put in at that point

16  on March 5th, you didn't put through an order

17  on ePurchase of a standing desk?

18              MR. LIEBERMAN:  Objection, you said

19        March 5th.

20        Q.    April 5th, excuse me.

21              At that point on April 5th you

22  didn't put through or around April 5th you

23  didn't put through an order at ePurchase for a

24  standing desk?

25        A.    No, I did not.

**LAKHANI**   27

Dee Lakhani

Page 26

```
 1                        Lakhani
 2          Q.    You believed the entire matter was
 3  resolved by using the customer service desk?
 4          A.    Yes.
 5          Q.    Do you recall what you heard about
 6  this next?
 7          A.    Yes.
 8          Q.    What did you hear?
 9          A.    Awhile after I got an e-mail from
10  Susan saying, "Where is my standing desk?"
11          Q.    All right.
12                Can you turn to Exhibit 10.  Is
13  that e-mail, the one on the bottom sent on
14  May 31st, 2005?
15          A.    Yes.
16          Q.    3:51 p.m?
17          A.    Yes.
18          Q.    That's the e-mail that you got
19  from Ms. Pinsky?
20          A.    Yes.
21          Q.    Then the response to that, is your
22  response the line above that?
23          A.    Yes.
24          Q.    All right.
25                Who is Dolly?
```

LAKHANI  28

Dee Lakhani

1                          Lakhani

2 concern, did you talk to anybody about it?

3       A.     I must have, I don't remember.

4       Q.     Do you recall?

5       A.     No, I don't remember.

6       Q.     Did you call Susan and ask her how

7 she was doing?

8       A.     I must have.

9       Q.     But you don't recall?

10      A.     I don't recall.

11      Q.     The 10 employees who worked for

12 you at that time, were they all about to be

13 for want of a better word, laid off?

14      A.     Yes.

15      Q.     They all had their positions being

16 terminated by Chase?

17      A.     Yes.

18      Q.     Was your position being terminated

19 by Chase as well?

20      A.     No.

21      Q.     Of the 10 employees that you had

22 working for you, did any of them continue

23 working for Chase in other capacities?

24      A.     Yes.

25      Q.     How many of the 10?

**CENTENO** 29

Migdalia Centeno

Page 6

1                          Centeno

2    Chase?

3         A.    Yes, I am.

4         Q.    What's your position?

5         A.    Business banker.

6         Q.    And what is a business banker?

7         A.    I handle business customers only.

8    They are business accounts instead of personal

9    accounts.

10        Q.    And how long have you been a business

11   banker?

12        A.    Year and a half.

13        Q.    What position did you hold with Chase

14   before that?

15        A.    Assistant branch manager.

16        Q.    Was that in a particular bank?

17        A.    At 55 Water Street and several other

18   branches.

19        Q.    Was 55 Water Street the last branch

20   that you were branch manager at?

21        A.    Yes.  Assistant branch manager.

22        Q.    Assistant branch manager.

23              Who was the branch manager?

24        A.    I went through three branch managers

25   at 55 Water Street.

Migdalia Centeno

1                          Centeno

2          Q.    And do you recall their names?

3          A.    Mike Mullinelli, Keith Swanson and

4    John Empirial.

5          Q.    Was Susan Pinsky a banking employee

6    at 55 Water Street?

7          A.    She was a Chase employee.

8          Q.    A Chase employee?

9          A.    Yes.

10         Q.    And she was doing home equity work

11   while you were there?

12         A.    Yes.

13         Q.    Did you have any responsibility over

14   her employment, as an assistant branch

15   manager?

16         A.    None at all.

17         Q.    Did you know her?

18         A.    Yes.

19         Q.    Just socially?

20         A.    She was working in my branch as a

21   home equity rep, I think.

22         Q.    But her manager was Ms. Lakhani?

23         A.    Yes.

24         Q.    And while -- did you talk to her on

25   occasion?

CENTENO  *30*

Migdalia Centeno

Page 8

1                          Centeno

2        A.    Yes.

3        Q.    Do you recall ever having

4    conversations with her about her back hurting?

5        A.    Yes.

6        Q.    Do you recall the nature of those

7    conversations?

8             I'm not asking for dates and times,

9    but what was the nature of your discussion

10   with her.

11       A.    Nothing specific.  She just said she

12   had back problems.

13       Q.    Do you recall ever having a

14   discussion with her where you were asked

15   whether she could -- withdrawn.

16            Do you recall any discussion with her

17   about her desk situation being changed to

18   accommodate her back pain?

19       A.    Yes.  She said she needed a special

20   desk.  And I asked her what is a special desk,

21   and had she spoken to her manager, Dee

22   Lakhani.

23            She explained it was a taller desk,

24   and she had spoken to Dee.

25       Q.    All right.  And that was one

Migdalia Centeno

Page 9

1                          Centeno

2      conversation, or you talked to her about this

3      several times?

4          A.    We had several conversations.

5          Q.    All right.  Do you ever recall having

6      a conversation with her where you asked her if

7      some alternative desk set up was satisfactory

8      to her?

9          A.    I did not ask her specifically if one

10     desk over another might be better.  When I saw

11     her working at a specific desk, I asked her is

12     that the desk that you need.  Is that helping

13     you. And she said, yes, this is what I need,

14     this is exactly what I need.

15         Q.    Is that called a CS service desk?

16               Was it a desk in the back of the

17     branch?

18         A.    A service desk.  That's where I

19     eventually put her.

20         Q.    You put her there?

21         A.    Yes.  The way the layout of that

22     branch is, we have two sections.  The main

23     section where the public walks into.  The back

24     section, were predominantly by appointment

25     only.

**CENTENO**   31

Migdalia Centeno

Page 10

1                      Centeno

2            She started to work in my main

3    section.  And I couldn't have her there

4    because she's visible to the public, and they

5    would think she's an employee not doing any

6    work.  So we had an exact desk in the back

7    that I switched her to.

8        Q.    What do you mean "an exact desk"?

9        A.    It's taller desk.  A customer service

10   desk.

11       Q.    And describe what a customer service

12   desk is?

13       A.    If you're standing in front of it,

14   its probably waist high.  And you get an

15   adjustable chair, you know, to suit your

16   height if you wanted to sit at it.

17       Q.    Is it a kind of desk used for

18   informational people in the front of a bank or

19   something?

20       A.    For service, yeah.  You walk into a

21   branch and say, I'd like to stop payment,

22   that's where you go.

23       Q.    All right.  So you -- you said

24   Ms. Pinsky was in the front and it would look

25   like she wasn't doing any work.

**CENTENO** 32

Migdalia Centeno

Page 12

1                    Centeno

2        Q.   You saw her working at the customer

3   service desk in the front?

4        A.   In the front.

5        Q.   She said that's exactly what I need,

6   so you came up with the idea of moving that

7   desk to the back, or putting a similar desk

8   like that in the back?

9        A.   Not a similar desk, an exact desk in

10  the back.  We had two customer service desks.

11       Q.   So you had that desk set up in the

12  back, and then you told Ms. Pinsky to move

13  there?

14       A.   Mm-hmm.

15       Q.   What did she say?

16       A.   She said fine.  Because it's what she

17  needed.

18       Q.   All right.  Did she say anything like

19  this is good until I get my standing desk?

20       A.   No.

21       Q.   Did she ever complain to you about

22  still being in pain as a result of that

23  customer service desk?

24       A.   I do not recall her complaining after

25  I moved her.

**CENTENO** 33

Migdalia Centeno

Page 13

1              Centeno

2        Q.   Did you get involved in any -- after

3    you moved her there, did you have any

4    discussions with anybody about Ms. Pinsky

5    standing at that -- utilizing the customer

6    service desk?

7        A.   No.   Just to tell Dee that that's

8    what I had done, her immediate supervisor.

9        Q.   And what did Dee say?

10       A.   Nothing.   She just said, oh, okay.

11       Q.   So the idea didn't come from Dee?

12       A.   No.

13       Q.   It was your idea?

14       A.   Yes.   After observing Susan at the

15   service desk.

16       Q.   Did you know there was any discussion

17   going on about ordering a standing desk?

18       A.   No.

19       Q.   Do you know what a standing desk is?

20       A.   Mm-hmm.

21       Q.   What's the difference between a

22   customer service and a standing desk?

23       A.   To me there is no difference.   It's a

24   standing desk.   It's a taller desk.   If you

25   stand by it, it is up to your waist or a bit

Migdalia Centeno

Page 14

1                        Centeno

2    higher.

3        Q.    Well, you said that the customer

4    service is up to your waist?

5        A.    Or a bit higher.

6              I mean, for me, it's up to my chest.

7        Q.    And the standing desk is a little

8    higher, couple of inches higher?

9        A.    I couldn't tell you exactly if it's

10   higher, the same height.

11       Q.    Is there any difference in the chair

12   that comes along with the --

13       A.    With the customer service desk?

14       Q.    Yes.

15       A.    Absolutely.  It's a adjustable.

16       Q.    The chair at customer service is

17   adjustable?

18       A.    Mm-hmm.

19       Q.    And the chair that comes with the

20   standing desk -- is there a chair that comes

21   with it?

22       A.    I do not know.

23       Q.    Has there been any standing desks

24   located at 55 Water Street?

25       A.    Not that I recall.  Not while I was