UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X

SUSAN PINSKY,

                                    Plaintiff,                          07 Civ 3328 (CM) (HP)

            - against -                                          **PLAINTIFF'S RULE
                                                                 56.1(A) STATEMENT**
JP MORGAN CHASE & CO.,                                           **OF MATERIAL FACTS
                                                                 IN DISPUTE**            __

                                    Defendant.

------------------------------------------------------------------- X

            Plaintiff, pursuant to Local Civil Rule 56.1(a) of the United States District Court for the

Southern District of New York, plaintiff either admits or disputes the Statement of Material

Facts submitted by defendant in support of its summary judgment motion.

            1.      Plaintiff Susan Pinsky received a Bachelor of Arts degree from Baruch College in
June 2002. See Lieberman Aff. at ¶ 4; Exhibit "1" at page 4 and Exhibit "2."

            Admitted.

            2.      At the time she worked for the Bank, Pinsky had Series 7 and Series 66 securities
licenses, as well as a Life & Health Insurance license, from a financial industry self-regulatory
organization. See Lieberman Aff. at ¶ 4; Exhibit "1" at page 6; and Exhibit "2."

            Admitted.

            3.      Between June 1997 and May 2005, Pinsky was employed as a Technical
Recruiter for Interim Technology, The Consulting Group, as a Senior Technical Recruiter for
Excel Partners, as a New York Metro Account Manager for Jobs.com, as a Financial Advisor for
Merrill Lynch, as an Personal Financial Advisor Assistant for Chase Investment Services Corp.,
and as a Home Equity Loan Officer for the Bank. See Lieberman Aff. at ¶ 5; Exhibit "1" at pages
5-6; and Exhibit "2."

            Admitted.

4.    Defendant Bank is a national banking association. See Exhibit "52" at ¶ 4.

Admitted.

5.    Pinsky began her employment with Chase Investment Services Corp., a subsidiary of JPMorgan Chase & Co., in November 2002, as a Personal Financial Advisor Assistant. See Lieberman Aff at ¶ 6; Exhibit "1" at page 5; Exhibit "2"; and Exhibit "51" at ¶ 5.

Admitted.

6.    Pinsky then was hired by JPMorgan Chase Bank, another subsidiary of JPMorgan Chase & Co., effective February 1,2004, as a Home Equity Loan Officer ("HELO"). See Jelinski Aff at ¶ 3; Liebeman Aff. at ¶ 6; Exhibit "2"; and Exhibit "51" at ¶ 5.

Admitted.

7.    The required qualifications for the HELO position include a Bachelors degree, two years experience with home finance sales, and knowledge of home lending industry and credit principals. Jelinski Aff at ¶ 3; Exhibit "3."

Admitted.

8.    The Bank's HELOs were responsible for supporting all aspects of the Bank's Home Equity Sales Process, including developing referrals fiom Chase Business Partners and generating new business, training and coaching Retail Financial Services, Private Financial Services and Small Business Financial Services personnel in managed branches regarding developing home equity referrals, and processing branch generated Home Equity leads. See Jelinski Aff. at ¶ 3; Exhibit "3."

Admitted.

9.    Beginning in February 2005, Pinsky was assigned to work as a HELO at the Bank's retail branch located at 55 Water Street, New York, New York. See Lieberman Aff. at ¶ 6; Pinsky 1; Lakhani 24; Centeno 29.

Admitted.

10.    JPMorgan Chase & Co., the Bank's holding company parent, has a domestic firmwide Disability and Reasonable Accommodation Policy (the "Reasonable Accommodation Policy"). See Jelinski Aff. at ¶ 4; Exhibit "4".

Admitted.

11.    The Reasonable Accommodation Policy in effect at the time Pinsky requested an accommodation stated that "JPMorgan Chase is committed to providing necessary and

reasonable accommodations with respect to a known physical or mental disability of a qualified
. . . employee when needed . . . to perform essential job functions." Exhibit "4" at p. 1.

        Admitted.

      12.     The Reasonable Accommodation Policy also stated that a "reasonable
accommodation is a change in the work environment or in the way 'things are usually done'
including, but not limited to, leave time, specialized equipment, etc., that enables a qualified
person with a disability to perform the essential functions of his or her job and which does not
cause an undue hardship to JPMorgan Chase.. .." Exhibit "4" at p. 1.

        Admitted.

      13.     The Reasonable Accommodation Policy provided that "[t]he reasonableness of an
accommodation and the issue of undue hardship to the firm are evaluated on a case-by-case
basis." Exhibit "4" at p. 1.

        Admitted.

      14.     The Reasonable Accommodation Policy also stated that "[i]n response to your
request for a reasonable accommodation to perform the essential functions of your job, your
Human Resources Business Partner . . . will work together with you and your manager to
evaluate your request and determine whether a reasonable accommodation is necessary and
appropriate." See Exhibit "4" at p. 1.

        Admitted.

      15.     On February 8, 2005, Pinsky first notified her Human Resources Business
Partner, Barbara Zimmer, and her manager, Dee Lakhani, that she was requesting that she be
provided with a standing desk because of back problems. See Lieberman Aff. at ¶ 7; Exhibit "5";
Pinsky 16.

        Admitted.

      16.     A standing desk is one on which the height of the work surface can be adjusted
and thus can be used either while standing or sitting. Pinsky 16 and 18.

        Admitted, in part.  An ergonomically designed standing desk has adjustable work

surfaces or a higher and a lower work surface, so that the person using the desk is comfortable

when sitting or standing.  In addition, a standing desk includes foot support, which is adjustable

depending on the height of the chair and the injury/disability being compensated.  In addition, a

standing desk comes with a matched, ergonomically structured chair which can be adjusted to

address the user's disability and which includes adjustable foot support.  Pinsky Declaration at

¶ 5.

17.    At that time, Zimmer advised Pinsky that she needed to submit medical
documentation regarding her physical condition to the Bank's Medical Department. Pinsky 16;
Zimmer 2 1.

Admitted.

18.    On February 24, 2005, Pinsky advised Zimmer that she had obtained medical
documentation from her chiropractor. See Lieberman Aff. at ¶ 8; Exhibit "6"; Pinsky 16.

Admitted.

19.    The chiropractor's note stated that Pinsky had "lower back pain and muscle
spasm, secondary to an Acute Strain/Sprain Syndrome of the Lumbosacral Spine and Pelvis",
should "refrain from extended periods of sitting (not to exceed 20 to 30 minutes)", and "would
benefit from the use of a 'standing desk', to avoid having to sit while working for more than the
recommended time fiame". &.Lieberman Aff. at ¶ 8; Exhibit "7."

Admitted, except that Dr. Weinberg also stated:  "These measures are necessary

to improve the outcome of this condition and to help prevent further exacerbation of her

symptoms."

20.    According to Pinsky, she faxed a copy of the letter from her chiropractor to
Miriam Negron of the Bank's Medical Department on February 24, 2005. Pinsky 16.

Admitted.

21.    Negron is the Regional Manager of the Bank's Medical Department. Negron 19.

Admitted.

22.    Pinsky does not have any proof that her fax was received by Negron. Pinsky 16.

Admitted.

23.    Ms. Negron does not have any recollection, and the Bank's Medical Department does not have any record, of receiving a facsimile from Pinsky on February 24, 2005. See Negron 20; Lieberman Aff. at ¶ 9.

        Admitted.

24.    On March 15,2005, Pinsky advised Zimmer that she had not heard anything fiom the Medical Department regarding her request for a standing desk. See Lieberman Aff. at ¶ 10; Exhibit "8."

        Admitted.

25.    On March 17, 2005, in response, Zimmer asked Pinsky to whom in the Medical Department she had sent the facsimile. See Lieberman Aff. at ¶ 10; Exhibit "9."

        Admitted.

26.    On March 31,2005, Pinsky responded that she remembered sending the facsimile to a person that Zimmer had identified for her, but admitted that she could not find her copy of the facsimile. See Lieberman Aff. at ¶ 10; Exhibit "1 0."

        Admitted.

27.    On April 4,2005, Pinsky wrote again to Zimmer and told her that: "I still have no standing desk. Exactly how long do I have to wait for it. I don't remember who I faxed the info to. It was to the name and number you gave me." Lieberman Aff. at ¶ 11; Exhibit "1 I."

        Admitted.

28.    Later that afternoon, Zirnmer responded: "I believe that the person whose name we were originally given may have left the bank. I have asked someone else in Health Services to follow-up. I would also suggest that you ask your manager, Dee, to follow-up as well. They cannot give her medical information but they should be able to tell her the status of the request." See Lieberman Aff. at ¶ 12; Exhibit "12."

        Admitted.

29.    On April 4, 2005, Pinsky faxed a copy of the letter from her chiropractor to the Medical Department. See Lieberman Aff. at ¶ 13; Exhibit "1 3."

        Admitted.

30.     On April 4,2005, Cindy Chan, a nurse in the Bank's Medical Department, sent an email to Lakhani, Pinsky, and Zirnmer approving Pinsky's request for a reasonable accommodation. Lieberman Aff. at ¶ 13; Exhibit "14"; Pinsky 17.

Admitted, in part.  Chan stated:  Ms. Pinsky would benefit from the use of a

'standing desk' [quotes in original].  Please make sure that the proper equipment is ordered for

Susan Pinsky."  See Defendant's Exhibit 17.

31.     That next day, Zimmer reminded Lakhani that: "since [Pinsky] is a HELO I assume that she has only 90 days remaining[, i]n that case, there may be less expensive alternatives that Medical can recommend [and usually the medical department calls the manager to discuss before just sending a request for the accommodation, I suggest that you call Cindy and have a conversation about the options." See Lieberman Aff. at ¶ 13; Exhibit "15."

Admited, except that Zimmer's e-mail followed an e-mail form Chan to Lakhani

instructing her to order the desk through the JP Morgan eSource homepage.  See Exhibit 15.

32.     On April 6, 2005, Pinsky wrote to Lakhani and Chan: "Do you know when my standing desk will be arriving? My back is killing me and right now I am working with my keyboard lodged atop a moving box." See Lieberman Aff. at ¶ 14; Exhibit "16."

Admitted.

33.     Pinsky told Lakhani that "she needed a standing desk because she was having back pains" and Lakhani then spoke with "the [B]ranch to figure out where are we going to put this desk and of course we should let them know." Lakhani 25.

Admitted.  In addition, Ms. Pinsky spoke repeatedly to Lakhani, including on

April 8, 2005, on which date she advised Lakhani that she was suffering a lot of pain.  Pinsky

Declaration at ¶ 9.

34.     When Lakhani spoke with the Branch, she was told "about the customer service desk which sounded like the standing desk that [Pinsky] was talking about," so Lakhani asked Pinsky "is this okay?" and "[s]he said yes and that was our decision." Lakhani 25.

Denied. At no time did Ms. Pinsky agree that the customer service desk was an acceptable alternative to a standing desk. The customer service desk bears no relationship or resemblance to a "standing desk." Pinsky Declaration at ¶¶ 10-12.

35.    On April 8, 2005, Lakhani proposed to Zimmer and Chan an alternative accommodation to the standing desk. Lieberman Aff. at ¶ 15; Exhibit "17."

Denied. On April 18, Lakhani sent an e-mail to Zimmer, which she copied to Chan, in which she stated, without foundation, that it would take a month to get a "standing desk." She also stated, inaccurately, that if it arrived in a month, Ms. Pinsky would only be able to use it for three weeks (Ms. Pinsky had nearly three months left at the branch working as a HELO). Lakhani also falsely stated that she spoke to the Sales Manager, when she only spoke to an Assistant Branch Manager. She also falsely stated that Ms. Pinsky "thought it would be a good idea as well, "even though Ms. Pinsky expressed no such view, or similar view, to Ms. Lakhani." Finally, Ms. Lakhani stated that "I don't know what a standing desk looks like, but the way Susan described it to me, it is no different than a customer service desk." Ms. Pinsky's description of a standing desk bore no relationship to a customer service desk, since the customer service desk at Water Street (a) does not have adjustable surfaces, (b) had a chair associated with it that was not adjustable to an individual's particular disability, and (c) created no means of foot support or relief. In fact, the customer service desk, which was never examined by a medical professional from JP Morgan, exacerbated Ms. Pinsky's disc problem. See Pinsky Declaration at ¶¶ 10 and 12; Dr. Weinberg Declaration at ¶ 7.

36.    In her email, Lakhani wrote that: "[M]y only concern is ordering this desk today, getting it a month from now and [Pinsky] using it for a total of 3 weeks (her last day is June 30th). Not only are we spending money on it, but the Water Street Branch will have no use for this desk afterwards and they will not have the space to leave it there so we will have to discard it. They will need to throw it away to make room for a banker (with a regular desk). I just spoke to Sales Manager there [Migdalia Centeno] and asked if Susan can stand at the Customer Service

desk in the back of the branch there is no traffic) and she said it may work. I ran this by Susan this morning and she thought it would be a good idea as well. I don't know what a standing desks looks like but the way Susan described it to me, it is no different than the customer service desk. Let me know if this is okay or is it mandatory that I order this desk?" See Liebeman Aff. at ¶ 15; Exhibit "17."

      Admitted, but see response to Statement of Fact No. 35.

    37.    Migdalia ("Dolly") Centeno was the Assistant Branch Manager at the 55 Water Street branch during the time that Pinsky worked as a HELO at that branch. See Centeno 29.

      Admitted.

    38.    Pinsky and Centeno discussed Pinsky's back problems and her need for an alternative desk arrangement. Centeno 30.

      Admitted.

    39.    After observing Pinsky working at a Customer Service Desk, Centeno asked Pinsky if that was the desk that she needed and Pinsky told her, "yes, this is what I need, this is exactly what I need." Centeno 30.

      Denied.  Pinsky never stated to Conteno that the customer service desk was

"exactly what I need."  Ms. Pinsky did agree to use it while she was waiting for the "standing

desk."  Pinsky Declaration at ¶ 11.

    40.    The Bank's Customer Service Desk is a taller desk, at least waist height or higher, at which Bank employees either can sit or stand. See Centeno 31, 33.

      Admitted.

    41.    Employees who sit at the Bank's Customer Service Desk have adjustable chairs so that employees of different heights can use the chairs and Desk while working. See Centeno 31, 33.

      Denied.  Ms. Pinsky could not adjust the chair at 55 Water Street, although she

attempted to do so.  Pinsky Declaration at ¶ 10.

    42.    On April 8, 2005, Chan advised Lakhani: "You do not need to order the desk as long as she can be accommodated by standing at the Customer Service Desk until she leaves her employment with JPMC on June 30th." Lieberman Aff. at ¶ 15; Exhibit "18."

Admitted, except that the Customer Service Desk did not accommodate Ms.

Pinsky's disability. Pinsky Declaration at ¶¶ 10 and 12.

43.     From on or about April 8, 2005 through May 3 1, 2005, Pinsky did not send any emails to Lakhani or Zimmer complaining about working at the Customer Service Desk or inquiring about the standing desk. Lieberman Aff. 7 16.

Admitted.  However, Ms. Pinsky repeatedly called Zimmer and Lakhani about

how much pain she was in, and repeatedly asked when the standing desk would arrive.  She was

repeatedly told, "I don't know."  Pinsky Declaration at ¶ 13, Czuchta Declaration at ¶ 3,

Guerraro Declaration at ¶ 3, Cuminsky Declaration at ¶ 3.

44.     Lakhani "asked [Pinsky] if a piece of furniture was okay, the customer service desk in the back", Pinsky eventually said yes, and Lakhani believed that the matter then was resolved. Lakhani 26.

Denied.  No such conversation ever occurred between Ms. Pinsky and Lakhani.

Pinsky Declaration at ¶¶ 10, 11, 12, 13, and 14.

45.     Pinsky also told Centeno that using the Customer Service Desk was "fine", "[b]ecause it's what she needed". Centeno 32.

Denied.  No such conservation ever occurred between Ms. Pinsky and Centeno.

Pinsky Declaration at ¶¶10 and 11.

46.     From on or about April 8, 2005 through May 3 1, 2005, Pinsky did not complain about working at the Customer Service Desk. Lakhani 27; Zimmer 22; Centeno 32.

Denied.  See response to Statement of Uncontested Facts No. 43.

47.     On May 3 1,2005, Pinsky complained to Lakhani and Zimmer about her back and asking whether there was "any word on [her] standing desk." Liebennan Aff at ¶ 17; Exhibit "19."

Admitted.

48.     On June 1,2005, Lakhani replied to Pinsky: "I was under the impression that you were standing at the CS service desk in the back which is a standing desk and that you did not want to order one b/c you can stand at that desk. Dolly and I spoke about this and then I called

you and you decided that it would be the best way to go. Am I missing something?" Lieberman Aff. at ¶ 17; Exhibit "20."

        Admitted.

49.     That same day, Pinsky responded to Lakhani: "Yes, you are missing quite a lot. I requested the standing desk originally in January. Then since nothing was done about it I called HR and they had me put in a second request for it. Dolly came up with the idea of using the service desk a month after the second time the desk was requested. Although the service desk is a lot better than the regular desk, it lacks the ability to provide sufficient support when I actually do sit. All this time, I was under the impression that the desk had been ordered, and I was using the service desk until it arrived." See Lieberman Aff. at ¶ 17; Exhibit "2 1."

        Admitted.

50.     The next day, Zimmer wrote to Pinsky: "From what I recall, Chase Medical approved of the service desk as a reasonable accommodation for your needs. They would have based their decision on the information provided frm your physician as to what you required. Since your position is being eliminated, and we were looking for a short term solution, this was deemed an appropriate way to meet your accommodation. There was not a desk ordered for you." See Lieberman Aff. at ¶ 17; Exhibit "22."

        Admitted, except that no medical professional ever deemed the customer service

desk an appropriate way to meet Ms. Pinsky's need for accommodation.  Pinsky Declaration at

¶ 12

51.     JPMorgan Chase & Co. has a Severance Pay Plan that sets forth certain benefits that may be available to eligible employees. See Jelinski Aff. at ¶ 5; Exhibit "23."

        Admitted.

52.     The Severance Pay Plan offers various forms of assistance, including financial assistance, to employees "whose employment involuntarily terminates as a result of the events specified in this Plan". See Exhibit "23", p. iii.

        Admitted.

53.     One of the "events" specified in the Plan is "an elimination . . . of the job position or functions held or performed by the Employee". See Exhibit "23", tj 3.1 (i)(c), pp. 5-6.

        Admitted.

54.    The Severance Pay Plan "condition[s] the effectiveness of the Notification and the payment of severance on the execution of a release". See Exhibit "23", tj 3.l(iii), p. 6.

    Admitted.

55.    The Severance Pay Plan further provides that only "an Employee who is not on a Leave of Absence may be a participant" in the Plan. See Exhibit "23", tj 3.1, p. 5.

    Admitted.

56.    Beginning in late 2004 and continuing through mid-2005, the Bank advised its Home Equity Loan Officers, including Pinsky, that it was going to eliminate all HELO positions. See Jelinski Aff. at ¶ 7; Pinsky 4; Zimmer 23; Lakhani 28.

    Admitted.

57.    On or about May 20, 2005, Lakhani provided Pinsky with formal written notice that her position was being eliminated and her employment would be terminated as of July 18, 2005.  See Jelinski Aff. at ¶ 8; Exhibit "24" at p. 1; Pinsky 5.

    Admittted, except that it was received on May 25, 2005.  See Pinsky Declaration at ¶ 15..

58.    The notice letter provided Pinsky with sixty (60) days paid notice of the elimination of her position and the proposed termination of her employment. &.Exhibit "24" at p. 1.

    Admitted.

59.    The notice letter also offered Pinsky seven (7) weeks of severance pay if she did not obtain another position with JPMorgan Chase during that period, on condition that Pinsky execute a proposed Release Agreement. See Jelinski Aff. at ¶ 9; Exhibit "24" at p. 1.

    Admitted, except that the Release did not take effect if Ms. Pinsky successfully

obtained another position.  Pinsky Declaration at ¶ 15 and Exhibit 24.

60.    The consideration offered Pinsky in exchange for her entering into the Release Agreement exceeded the benefits to which Pinsky already was entitled, since Pinsky had no other right to any severance benefits. See Jelinski Aff. at ¶ 9; Exhibits "23" p. 4 and "24."

    Admitted.

61.    The Bank encouraged Pinsky to consult an attorney regarding the proposed Release Agreement. See Exhibit "24" at p. 5.

Denied.  The Lakhani letter said nothing about seeking the advice of counsel, and at oral discussions the need to consult an attorney was never mentioned.  At Ms. Pinsky's one meeting with Lakhani, Lakhani guaranteed a job in the Mortgage Department if employees signed the agreement.  Pinsky Declaration at ¶ 16, Defendant's Exhibit 25.

62.    Pinsky was given forty-five (45) days in which to consult an attorney regarding, and to consider, the proposed Release Agreement before needing to execute and return it in order to agree to its benefits.  See Exhibit "24" at p. 5.

Denied.  No such language existed in the Lakhani letter, and Ms. Pinsky was never told that she had "45 days in which to consult an attorney."  Pinsky Declaration at ¶ 16, Defendant's Exhibit 25.

63.    Pinsky read the release, "pretty much" understood it, but "really didn't think much of it".  See Pinsky 6.

Denied.  Ms. Pinsky did not understand the release, was in extreme pain during the period she was being asked to sign it, and signed it because of Lakhani's promise of future employment.  Pinsky Declaration at ¶ 17.

64.    Pinsky had the notice letter and Release Agreement for between four and five weeks before she executed and returned the Release Agreement to the Bank.  See Exhibits "24" and "25"; Pinsky 5.

Denied.  Ms. Pinsky received the letter around May 26, 2005, and left work due to her hip and back pain on June 9, 2005.  She signed the agreement under pressure from Lahkani, who repeatedly called her.  Pinsky Declaration at ¶ 18.

65.    On June 24, 2005, Pinsky executed the Release Agreement proposed in the May 20, 2005 notice letter and returned it to JPMorgan Chase.  See Jelinski Aff. at ¶ 10 and Exhibit 25.

Admitted.

66.    Under the terms of the Release Agreement executed by Pinsky, she agreed to "release to the fullest extent permitted by law JPMorgan Chase Bank (and any predecessor or

12

successor entities thereof) and, its and their affiliates, subsidiaries, parent corporations (including J.P. Morgan Chase & Co.) ... (hereinafter "JPMC" or "RELEASEES") from any and all suits, claims, charges, obligations, causes of action or demands in law or in equity .. . arising from or relating to my employment relationship with JPMC and/or the termination' thereof, from the beginning of the world up to and including the date of execution of this Release (whether known or unknown to me and including any continuing effects of any acts or practices prior to the date of execution of this RELEASE), including, but not limited to: .. . any employment and/or benefit related claims under any federal, state or local law, employment law or civil rights law.. .." See Exhibit "25."

Admitted, although this states only one term and condition of the release.

67.    JPMorgan Chase & Co. has a domestic firm-wide Disability Leave Policy. See Jelinski Aff at ¶ 6; Exhibits "26", "27" and "28."

Admitted.

68.    The Disability Leave Policy in effect in June 2005, when Pinsky began her disability leave, stated that it "provides time off for employees when they have an illness or injury that continues for more than one workweek." See Exhibit "26" at p. 1; see also Exhibits "27" and "28."

Admitted.

69.    The Disability Leave Policy defines "disability" as a period greater than seven (7) consecutive days when an employee is "unable to perform the material and substantial duties of [his/her] position, on an active employment basis". See Exhibit "26" at p. 1; see also Exhibits "27" and "28."

Admitted.

70.    The Disability Leave Policy stated that it "provides disability pay benefits in the form of full or partial pay for eligible employees." See Exhibit "26" at p. 1; see also Exhibits "27" and "28."

Admitted.

71.    The Disability Leave Policy stated that "[t]here is a one-week wait period, i.e., seven consecutive calendar days, for disability pay benefits." See Exhibit "26" at p. 2; see also Exhibits "27" and "28."

Admitted.

72.    The Disability Leave Policy stated that "[b]eginning on the eighth consecutive calendar day of your disability leave, you may be eligible to receive disability pay benefits at

either 100% or 60% pay (up to a total of 25 weeks within a calendar year), in accordance with the Disability Pay Benefits Schedule below [: for 3 to 4 years of recognized service, 7 weeks at 100% and 18 weeks at 60%]." See Exhibit "26" at pp. 2-3; see also Exhibits "27" and "28."

> Admitted.

73.     The Disability Leave Policy stated that "[i]n the event you continue to be disabled as defined within this policy after taking an approved 26-week disability leave under this policy, you may be eligible to receive long-term disability (LTD) benefits if you elected LTD benefits coverage, under the terms of JPMorgan Chase's LTD benefit plan." See Exhibit "26" at p. 4; see Exhibits "27" and "28."

> Admitted.

74.     The Disability Leave Policy provides that, when an employee is approved for long-term disability benefits, the employee will be placed on LTD employment status. See Exhibit "26" at p. 4; see also Exhibits "27" and "28."

> Admitted.

75.     The Disability Leave Policy provides that, when an employee's position is eliminated during an approved disability leave, the employee's employment termination date typically will be deferred until the employee's disability leave has ended. Exhibit "26" at p. 6; see also Exhibits "27" and "28."

> Admitted.

76.     The Disability Leave Policy stated that "[w]hile you are on a disability leave you may continue many of the benefits you elected provided you make the necessary contributions." See Exhibit "26" at p. 7; see also Exhibits "27" and "28."

> Admitted.

77.     The Disability Leave Policy stated that "[y]our employment may be terminated if it is determined that you, either before or during your leave, committed a material violation of the firm's Code of Conduct or a major violation of any JPMorgan Chase policies." See Exhibit "26" at p. 7; see also Exhibits "27" and "28."

> Admitted.

78.     Pinsky submitted documentation regarding her back condition from her physician to the Bank's Medical Department on or around April 4, 2005. See Exhibit "13."

Admitted, except Ms. Pinsky asserts that such documentation was provided earlier. Pinsky Declaration at ¶ 6.

79.    On June 8, 2005, Pinsky advised Lakhani and Zimrner: "Due to the deterioration of my back condition (as shown in my MRI), my physicians have instructed that I cease to work immediately.. .. I intend to finish working at the end of next week as planned, working half to full days." Lieberman Aff. at ¶ 18; Exhibit "29."

Admitted.

80.    That same day, Zimrner replied: "If you have been directed by your physician to cease work immediately, I need to ask that you comply with his directive. Please finalize anything that you are working on and we will process a request for a leave of absence. I will ask that Dee begin your Leave of Absence effective immediately." See Lieberman Aff. at ¶ 18; Exhibit "30."

Admitted.

81.    As a result of her back condition, Pinsky commenced a short-term disability leave * of absence from her employment with the Bank beginning on or around June 13, 2005. See Lieberman Aff. at ¶ 20; Exhibit "3 1" at p. 1; Pinsky 7.

Admitted.

82.    Pinsky was approved for, and received, short-term disability benefits for the period from June 13,2005 through December 11,2005. See Lieberman Aff. at ¶ 20; Exhibit "3 1" at p. 1.

Admitted.

83.    Pinsky elected long-term disability coverage under the Bank's employee benefit plan for the 2002,2003,2004,2005,2006, and 2007 benefits years. See Jelinski Aff. at ¶ 12.

Admitted.

84.    Effective December 12, 2005, Pinsky was approved by The Hartford for longterm disability benefits. See Jelinski Aff. at ¶ 12; Exhibit "3 1" at p. 1; Exhibit "32"; Pinsky 8.

Admitted.

85.    Pinsky was placed on LTD leave status as of December 12, 2005. See Exhibit "31"atp. 1.

Admitted.

86.    On July 10, 2007, Pinsky's surgeon cleared her to return to work. <u>See</u> Lieberman Aff. at ¶ 21; Exhibit "33"; Pinsky 9.

Denied.  Pinsky Declaration at ¶ 19.

87.    On August 9, 2007, The Hartford, the long-term disability insurance carrier for the Bank's long-term disability policy, advised Pinsky that her long-term disability benefits were being terminated as of July 10, 2007 based on information submitted by Pinsky's health care providers. <u>See</u> Lieberman Aff. at ¶ 21 and Exhibit "34."

Admitted, except that Ms. Pinsky appealed that decision and is not in litigation

concerning it.  Pinsky Declaration ¶¶ 19 and 20.

88.    Since Pinsky's long-term disability benefits had been terminated, on September 13 and 14, 2007, Defendant paid Pinsky ten (10) weeks of severance pursuant to the Severance Pay Plan. <u>See</u> Jelinski Aff. at ¶ 17; Exhibit "35."

Admitted, except that such payment was accepted without prejudice and without

plaintiff being given a proper opportunity to find a new job at Chase.  Pinsky Declaration at

¶¶ 19 and 20.

89.    Pinsky elected medical, dental, and vision coverage for the 2006 and 2007 benefits years under the Bank's benefit plan. <u>See</u> Exhibit "52" 7 58.

Admitted.

90.    Under the Bank's benefit plan, medical, dental, and vision coverage are paid in part by the employee and in part by the Bank. <u>See</u> Exhibit "52" '1[ 59.

Admitted.

91.    The Bank has paid for medical, dental, and vision coverage for Pinsky for the 2006 and 2007 benefits years. <u>See</u> Exhibit "52" '1[ 60.

Admitted.

92.    JPMorgan Chase & Co. has a firm-wide Code of Conduct. <u>See</u> Lieberman Aff. 2 and Exhibits "36", "37", and "38."

Admitted.

93.     The Code of Conduct applies to all employees, including those on disability leaves. <u>See</u> Lieberman Aff. 3; Exhibits "36" at § 1.1, "37" at § 1.1, and "38" at § 1.1.

        Admitted.

94.     Pinsky understood that she still was an employee of the Bank, even though on disability leave. Pinsky 10.

        Admitted.

95.     Every JPMorgan Chase employee's compliance with the Code of Conduct and with other applicable policies and procedures also is a term and condition of his/her employment by JPMorgan Chase. <u>See</u> Lieberman Aff. at 24; Exhibits "36" at § 1.3, "37" at § 1.3, and "38" at § 1.3.

        Admitted.

96.     The Code of Conduct was and is available to all employees on the Firm's intranet website. Lieberman Aff. at ¶ 25; Exhibits "36" at § 1.6, "37" at § 1.6, and "38" at § 1.6.

        Admitted.

97.     Section 6.3.2 of the November 2004 Code of Conduct, in effect from November 2004 through February 2006, provided that: "Subject to the exclusions listed below, you are required to pre-clear: any outside activity for which you will be paid, including a second job. whether or not you will be paid, any affiliation with another business as a director, officer, advisory board member, general partner, owner, consultant, holder of 5% or more of the business' voting equity interests, or in any similar position." See Lieberman Aff. at ¶ 26 and Exhibit "36."

        Admitted.

98.     Section 6.3.2 of the February 2006 Code of Conduct, in effect from February 2006 through February 2007, provided that: "Subject to the exclusions listed below, you are required to pre-clear: (i) any outside activity for which you will be paid, including a second job. (ii) whether or not you will be paid, any affiliation with another business as a director, officer, advisory board member, general partner, owner, consultant, holder of 5% or more of the business' voting equity interests, or in any similar position." Lieberman Aff. at ¶ 27 and Exhibit "37."

        Admitted.

99.     Section 6.3.2 of the February 2007 Code of Conduct, in effect from February 2007 to the present, provides that: "Subject to the exclusions listed below, you are required to pre-clear: (i) any outside activity for which you will be paid, including a second job. (ii) whether

17

or not you will be paid, any affiliation with another business as a director, officer, advisory board member, general partner, owner, consultant, holder of 5% or more of the business' voting equity interests, or in any similar position." See Lieberman Aff. at ¶ 28 and Exhibit "38."

       Admitted.

100.    All JPMorgan Chase employees are required to affirm their understanding of, and compliance with, the Code of Conduct on a recurring basis. See Lieberman Aff. ¶ 29; Exhibits "36"at 5 1.7, "37"at 5 1.7, and "38"at 5 1.7.

       Admitted.

101.    On December 18, 2002, October 21, 2003, and March 3, 2005, Pinsky affirmed that she "read, under[stood], and am in compliance with the" Code of Conduct. See Lieberman Aff at ¶ 29 and Exhibits "39", "40" and "41"; Pinsky 2.

       Admitted.

102.    Pinsky testified that she was not familiar with, and did not understand, the requirements of the Code of Conduct. Pinsky 2 and 3.

       Admitted.

103.    On April 20, 2007, Defendant learned that Pinsky was identified as being associated with Tri-State Biodiesel LLC ("Tri-State"), an alternative fuel company. See Jelinski Aff. 7 13.

       Admitted.

104.    According to Tri-State's website as of April 20, 2007, "Susan Pinsky, Chief Administration Officer - Susan recently left her position as an Assistant Treasurer at JP Morgan Chase to join the Tri-State Biodiesel team.. .. Her expertise in management and her leadership skills have made her the perfect fit to build the corporate structure of our company. She currently manages all the City and State Licensing, the Company registrations and the financials." See Jelinski Aff. 14; Exhibit "42"; Pinsky 14.

       Admitted.

105.    No later than July 9, 2007, Tri-State changed its entry regarding Pinsky by deleting the reference to JPMorgan Chase, but otherwise leaving the description of Pinsky's relationship to Tri-State unchanged. Jelinski Aff. ¶ 15; Exhibit "43"; Pinsky 15.

       Admitted.

106.    Pinsky testified that she helped "build the corporate structure of the company of Tri-State Biodiesel", and completed paperwork for, and managed, "monthly or quarterly reports" and "all the City and State licensing companies, registration and the financials." Lieberman Aff. at ¶ 31 ; Pinsky 12.

Admitted.

107.    Pinsky also was and is an investor in Tri-State Biodiesel LLC. Lieberman Aff. at ¶ 32; Exhibit "44"; Pinsky 10.

Admitted.

108.    On March 5, 2007, Pinsky executed her Subscription Agreement with Tri-State Biodiesel LLC, stating in handwriting that her title was "Chief Administration Officer". Exhibit "44" at p. 8, Pinsky 13.

Admitted.  However, Pinsky only owned a 1/2% share of the Company.  Pinsky

Declaration at ¶¶ 21, 22, 23, 24, 25.

109.    Pinsky testified that she was Tri-State's corporate secretary and an officer of the company. Pinsky 14.

Admitted, but see Pinsky Declaration  at ¶¶ 21-25.

110.    Pinsky neither requested, nor received, any pre-clearance from the Bank regarding her performance of services for Tri-State Biodiesel, despite being required to do so by the JPMorgan Chase Code of Conduct. See Wells Aff. at ¶ 4; Pinsky 15.

Denied.  Given plaintiff's minor role and stake in Tri-State, she believed it not

required.  Pinsky Declaration at ¶¶ 21-25.

111.    Pinsky neither requested, nor received, any pre-clearance from the Bank regarding her investments in Tri-State Biodiesel, despite being required to do so by the JPMorgan Chase Code of Conduct. See Wells Aff. at ¶ 5; Pinsky 15.

Denied.  Given plaintiff's minor role and stake in Tri-State, such pre-clearance

was not required.  Pinsky Declaration at ¶¶ 21-25.

112.    On or about February 6,2006 Pinsky filed a Complaint of Discrimination with the New York State Division of Human Rights. See Lieberman Aff at ¶ 34 and Exhibit "45."

Admitted.

113.    On March 27, 2007, Pinsky filed her Complaint in this action in New York State Supreme Court, asserting claims of disability discrimination under the New York State Human Rights Law and the New York City Human Rights Law. See Lieberman Aff. at ¶ 38 and Exhibit "46."

        Admitted.

114.    Plaintiffs Complaint was served on Defendant on March 28, 2007. See Lieberman Aff. at ¶ 35.

        Admitted.

115.    On April 26,2007, Defendant removed this action from New York State Supreme Court, New York County, to the United States District Court for the Southern District of New York. See Lieberman Aff. at ¶ 36.

        Admitted.

116.    On April 26, 2007, the New York State Division of Human Rights issued an Annulment Determination regarding Pinsky's Complaint of Discrimination. Lieberman Aff. at ¶ 37 and Exhibit "47."

        Admitted.

117.    On May 15, 2007, Defendant filed its Answer to Pinsky's Complaint. See Lieberman Aff. at ¶ 38 and Exhibit "48."

        Admitted.

118.    On June 1, 2007, the Equal Employment Opportunity Commission issued a Dismissal and Notice of Rights to Plaintiff. & Lieberman Aff. at ¶ 39 and Exhibit "49."

        Admitted.

119.    On June 4, 2007, Defendant filed its Amended Answer and Counterclaims to Pinsky's Complaint. See Lieberman Aff. at ¶ 38 and Exhibit 50."

        Admitted.

120.    On September 19, 2007, Pinsky filed a First Amended Complaint in this action, asserting an additional claim of disability discrimination under the Americans with Disabilities Act. See Lieberman Aff at ¶ 40 and Exhibit 51 ."

        Admitted.

121.    According to the allegations of the Amended Complaint, all of Plaintiffs claims accrued during a period between February 24, 2005 (when she claims to have first requested a reasonable accommodation) and June 13, 2005 (when she began her leave of absence). See Exhibit "51" at ¶¶ 9-16.

        Admitted.

122.    On January 30, 2008, Defendant filed its Answer and Counterclaims to Pinsky's Amended Complaint. Lieberman Aff. at ¶ 40 and Exhibit "52."

        Admitted.

Dated: New York, New York
       June 16, 2008

                             SCHWARTZ, LICHTEN & BRIGHT, P.C.
                             Attorneys for Plaintiff

                             By:_____
                               Arthur Z. Schwartz (AZS 2663)
                             275 Seventh Avenue, 17th Floor
                             New York, New York  10001
                             (212) 228-6320