UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X

SUSAN PINSKY,

                                 **Plaintiff,**               **07 Civ 3328 (CM)**

      - against -

JP MORGAN CHASE & CO.,

                                  **Defendant.**

------------------------------------------------------------------ X

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

This Memorandum of Law is submitted in opposition to defendant's Motion for

Summary Judgment on the Complaint and its Counterclaims.

### STATEMENT OF FACTS

Susan Pinsky had many skills when she came to Chase. While at Chase, she was

promoted twice, becoming a Home Equity Loan Officer ("HELO") in two years, and became a

top performer. Even when Chase was phasing out its Home Equity department, she was sure

that she would land another job at Chase, like most of the other HELOs did. Ms. Pinsky had

already been offered two jobs and was solicited for a third job. She had important licences,

which made her a valuable employee. She was licensed by and registered with the Securities

and Exchange Commission and a registered member of the National Association of Securities

Dealers ("NASD").

In the winter of 2004-2005, Ms. Pinsky began to experience an aching sensation in her left hip. She immediately obtained treatment from Dr. Stephen Weinberg, a chiropractor, and Heather Case, a physical therapist. By February 2005, the problem had worsened despite the therapy, visits to two orthopedic surgeons, an acupuncturist, and consultations with other chiropractors, physical therapists, and a physiatrist.

In early February, 2005, Dr. Weinberg diagnosed Ms. Pinsky's problem as an "acute strain/sprain of the lumbosacral spine and pelvis," which Ms. Pinsky understood to be an injury to her lowest disc, and recommended that she use a "standing desk" at work so as to avoid having to sit for more than 20 to 30 minutes at a time.

An ergonomically designed standing desk has adjustable work surfaces, and/or a higher and lower work surface, so that the person using the desk is comfortable when sitting or standing. In addition, a standing desk includes foot support, which is adjustable depending on the height of the chair and the injury or disability being compensated. In addition, a standing desk comes with a matched, ergonomically structured chair, which can be adjusted to address the user's disability and which includes adjustable foot support. Literature and descriptions of a standing desk are annexed to the Pinsky Declaration as Exhibit A.

When Ms. Pinsky received the letter from Dr. Weinberg, she advised Human Resources Director Barbara Zimmer that she had it. She then faxed it, at Zimmer's direction, to Miriam Negron at the Chase Medical Department. Ms. Pinsky waited two weeks and contacted Zimmer again and told her that she hadn't heard from anyone. Zimmer asked Pinsky who she faxed the doctor's letter to. Pinsky responded a number of times, stating that she lost the fax cover sheet but that she had sent it to the person Zimmer said to send it to. Pinsky e-mailed Zimmer about the issue on March 31 and April 4, and on April 14, 2005, Zimmer told Pinsky that the person

2

Pinsky had faxed it to had left the bank (see Defendant's Ex. 12), and that she and Pinsky's supervisor, Dee Lakhani, would follow up.  That afternoon, Pinsky found the original fax (Defendant's Ex. 13) and re-faxed it.  That same afternoon, Cindy Chan, a nurse with authority in Chase Medical, e-mailed Pinsky's supervisor telling her to "make sure" that Pinsky got a standing desk.

On April 5, 2005, following an inquiry from Lakhani, Nurse Chan instructed Pinsky's supervisor how to order the desk through Chase's in-house ePurchase website.  (See Defendant's Ex. 15.)

On April 5, 2005, Zimmer e-mailed Lakhani and suggested that she speak with Nurse Chan to discuss "less expensive alternatives."

Ms. Pinsky spoke repeatedly to Lakhani about the pain she was in and asked her when the standing desk would arrive.  On April 8, Pinsky spoke with Lakhani, who said she didn't know what was holding up the desk.

Pinsky never had a conversation with Ms. Lakhani about using the tall customer service desk.  In May 2005, after missing work for four days due to back pain — four days which Ms. Pinsky spent on her back — Migdalia Centeno, the Assistant Branch Manager, asked Pinsky whether she would like to use the service desk in the back of the branch until the standing desk arrived.  Pinsky agreed to try it while she waited for the standing desk.  She never admitted that it was a substitute for a standing desk. The customer service desk did not have adjustable surfaces, had a chair associated with it that could not be adjusted to alleviate Pinsky's disability, and had no means of foot support or relief.  Annexed to Ms. Pinsky's Declaration are photos of her sitting at the service desk she was assigned to, demonstrating the lack of  support provided by the desk when she was sitting.

Ms. Pinsky never told Migdalia Centeno that the customer service desk was "exactly what I need." She complained repeatedly about the slow pace in getting the standing desk and made her discomfort known to everyone on the bank floor. (See Declarations of Diana Czuchta, Christopher Guerrera, John Lauria, and Caroline Cumiskey.)

Nurse Chan was given misinformation about Ms. Pinsky's agreement to use the service desk when she wrote to Ms. Lakhani on April 8, 2005 (Defendant's Ex. 18) about the standing desk. Even with the misinformation, Nurse Chan never said that the customer service desk was an acceptable substitute. She simply said that it "could" be a substitute if it accommodated Pinsky's disability. She never spoke to Pinsky about it, and no one from the Medical Department looked at the customer service desk and chair, examined Pinsky, or made any sort of medical determination that the customer service desk accommodated her disability. In fact, it is likely that the customer service desk and that chair worsened her condition (see Declaration of Dr. Stephen Weinberg) — by June 9, 2005, Ms. Pinsky had a herniated disc, and in August 2005, an orthopedic exam discovered massive labral tearing in her left hip.

Between April 8, 2005 and May 31, 2005, Ms. Pinsky made numerous complaints to Zimmer, Centeno, Lakhani, and her fellow employees about how uncomfortable she was. During that period, she missed numerous days of work due to pain.

Ms. Pinsky never agreed to the customer service desk as an accommodation, In fact, she wrote to Lakhani, on May 31, 2005, inquiring about the status of her standing desk.

Ms. Pinsky received a severance letter from Dee Lakhani on May 25, 2005. It was Pinsky's understanding that the Release referred to in the letter would not take effect if she found a new position with Chase. The letter stated, on page 1, that the severance payments would occur only if she was unable to secure another position with Chase. It was Pinsky's intention to

4

secure another position, and she interviewed for several and posted her resume. As a result, she got solicited for positions. (See e-mail annexed to the Pinsky Declaration as Exhibit C.) Most of the other HELOs in her division were successful in obtaining other positions at Chase. (See Response to Interrogatories, annexed to the Pinsky Declaration as Exhibit D.) Chase hired thousands of people into bank positions in 2005. Annexed as Exhibit E to the Pinsky Declaration are several of hundreds of pages of positions posted for hiring by Chase in 2005 that were provided to plaintiff in discovery.

At no time did Chase advise Pinsky to consult an attorney. The letter from Lakhani said nothing about consulting an attorney (see Defendant's Ex. 24). What Lakhani did do was guarantee that Ms. Pinsky would get a new job if, and only if, she signed the Release.

By the end of May, Ms. Pinsky was in tremendous pain and was getting by only because she was taking many painkillers. She had to stop working after June 9, 2005, and throughout the remainder of June, July, and August dealt with my pain through bed rest and use of Vicodin, Percoset, and muscle relaxants. She was in no medical or emotional state to consult an attorney. All Ms. Pinsky knew was that if she wanted to come back to Chase, she had to sign the Release.

Ms. Pinsky finally signed the Release after Lakhani made repeated phone calls to her at home, telling her that her ability to gain new employment depended on the signing of the Release. Pinsky was on a leave of absence, and actually was not under threat of losing her job until she was ready to return. She later learned that the 60-day period referred to in Lakhani's May 20 letter was extended, indefinitely, while she was on leave — she wasn't going to be terminated while on leave, and shouldn't have had to sign the Release while out on leave. Nevertheless, Lakhani kept calling and insisting that if Pinsky didn't sign by the end of June, she would never work at Chase again. As a result, Pinsky signed the document.

On July 10, 2007, after being out of work for two years and undergoing left hip orthoscopy, Ms. Pinsky's surgeon, Bryan Nestor, stated that she was cleared to return to work on September 1, 2007. (See Defendant's Ex. 33.) In August, Dr. Richard Koffler, who was Ms. Pinsky's post-surgical treating physician, said in a letter that she would not be able to return to work until a second surgery occurred in October 2007. See letter annexed as Exhibit E to the Pinsky Declaration. Nevertheless, the disability carrier, Hartford, discontinued Ms. Pinsky's insurance coverage effective July 10, 2007. She appealed and made my disagreement with that decision known to Chase. See Exhibit F to the Pinsky Declaration. Ms. Pinsky also made it known, through counsel, that when she was ready to work, she wanted to return to Chase and forgo the severance package. See Exhibit G to the Pinsky Declaration. Nevertheless, Chase terminated Ms. Pinsky on September 13, 2007 and automatically deposited the full severance payment into her account, without giving her time to do a job search.

This is an important point. Ms. Pinsky received the layoff letter from Lakhani on May 25, 2005, and began her leave of absence on June 10, 2005. At that point, the 60 days she had to find a new job or be laid off stopped. Although Hartford terminated her disability payments effective July 10, 2007, they actually paid her benefit for all of July and sent her termination letter on August 9, 2007. Her attorney wrote to Chase on July 16, 2007, asking that they be made aware of all job opportunities. Ms. Pinsky heard nothing from Chase about job opportunities before receipt of Chase's termination letter of August 14, 2007.

After Ms. Pinsky had been out for a year, she became involved with a group of environmentalists looking for a creative way to clean up the air. Together, they came up with the idea of establishing a business which would collect waste cooking grease from restaurants and turn it into biodiesel. A corporation was created, and Pinsky made an investment of

$25,000, which brought her 0.5% of the company.  This was a purely speculative investment; the money was used to pay various startup costs.

Those who started the company, which they called Tri-State Biodiesel, agreed to contribute time and energy, as well as money to the startup effort.  Ms. Pinsky's contribution of time and energy was quite limited since she could not sit and had to lie down during meetings. Generally, she proofread documents prepared by others and filled out several simple forms. Everyone in the founding group was given a title.  Pinsky's was "Chief Administration Officer." On certain documents, she was called the "Corporate Secretary," which meant that she held the corporate seal and kept minutes of meetings.  Tri-State Biodiesel held no Directors Meetings and functioned rather informally until May 2008, well after Pinsky was terminated by Chase.  In June 2007, after Chase began to pressure Tri-State Biodiesel for information, Pinsky have up her title and was asked to stop participating in meetings.

Ms. Pinsky was never paid any money by Tri-State Biodiesel for work she performed. While she was with Tri-State, it created a Board of Directors, but Ms. Pinsky was not on it.  The company was not approved for a loan, which allowed it to commence its business, until April 2008.  Because of this litigation, even Pinsky's limited participation ended, since Tri-State, which was applying for financing, was very averse to being involved in litigation.

At no time did Ms. Pinsky believe that Chase needed to approve her limited involvement in Tri-State.  Section 6.3.2 of the Code of Conduct requires clearance for positions "similar" to holding 5% interest in a business or being a director (which she was not), general partner, or owner.  Pinsky had a minor role, doing proofreading and taking minutes at meetings of a group of dreamers who had a good idea which they publicized on the web.  Perhaps she would have played a larger role if Chase hadn't sued her over her participation.

7

Tri-State did not and will not compete with Chase in any way, and Ms. Pinsky's association with the business hasn't caused an injury of any nature to Chase.

## ARGUMENT

### SUMMARY JUDGMENT IN THIS MATTER IS INAPPROPRIATE.

Summary judgment is proper only "if the pleadings, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to, and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(C). See also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Upon consideration of a motion for summary judgment, the court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In making this determination, the Court is required to view the evidence presented by the movant in the light most favorable to the non-moving party. Adickes v. Kress & Co., 398 U.S. 144, 157 (1970). Accordingly, "summary judgment is appropriate when, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." Leon v. Murphy, 988 F.2d 303, 308 (2d Cir. 1993).

### POINT I

### THE ENFORCEABILITY OF THE RELEASE TURNS ON A DISPUTED ISSUE OF FACT.

Plaintiff does not dispute the assertion that employees may waive their rights under various employment-related civil rights statutes. However, such a waiver must have been entered into knowingly and voluntarily. Alexander v. Gardner-Denver Co., 415 U.S. 36, 52 n.

8

15 (1974); Bormann v. AT&T Communications, Inc., 875 F.2d 399 (2d Cir.), cert. denied, 493 U.S. 924 (1989).

The Second Circuit has directed the courts to consider a set of factors in determining whether a waiver was entered into knowingly and voluntarily. These factors are (1) plaintiff's education and business experience; (2) the amount of time the plaintiff has access to the agreement before signing it; (3) the role of plaintiff in deciding the terms of the agreement; (4) the clarity of the agreement; (6) whether the plaintiff was represented by or consulted with an attorney; and (6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was entitled by contract or law. Bormann, 875 F.2d at 403. The Bormann court highlighted the importance of plaintiff's representation by an attorney ("[our] list is obviously not exhaustive, and we would add to it whether an employer encourages or discourages an employee to consult an attorney ... and whether the employee had a fair opportunity to do so"), but stated that the "totality of the circumstances should be considered when determining the validity of a waiver." Id.

The application of the Bormann criteria by various courts gives some guidance about how they should be applied in this case. In Bormann, the court approved a denial of summary judgment where an issue of fact existed about defendant misrepresenting the effect of the release. Id. Had this not been the case, the court would have found the release to have been entered to have been entered into voluntarily because the plaintiffs were "experienced executives familiar with reading and analyzing contracts," that the release had language about the right to consult an attorney, and because there was no economic duress. Id.

In Evans v. Waldorf-Astoria Corp., 872 F.Supp. 911, 913 (EDNY 1993), Judge Johnson found a voluntary waiver where the plaintiff was represented by counsel provided by her union,

9

several offers were rejected as inadequate, and the agreement expressly required the withdrawal of charges at the EEOC and State Human Rights Division.

In Ossai v. Digital Equipment, 1994 WL 792592 (DWH 1994), the New Hampshire District Court applied the Bormann criteria and found a voluntary waiver where plaintiff had a masters degree in electrical engineering and business administration, had 45 days with full pay to consider the agreement and seven additional days to rescind, was advised by the document to seek legal advice, and was provided with free job search services for seventeen weeks, at no cost, after signing the document. 1994 WL 792592 at *3-4.

In Nicholas v. NYNEX, 929 F.Supp. 727 (SDNY 1996), Judge Conner found a voluntary waiver where the agreement, in capital letters, stated: "I ... KNOW THAT I AM GIVING UP IMPORTANT RIGHTS. I AGREE WITH EVERYTHING IN [THE AGREEMENT]; I AM AWARE OF MY RIGHT TO CONSULT AN ATTORNEY BEFORE SIGNING ... ." The plaintiff had the document, in hand, for nearly two months, met with an attorney to discuss the release, and received $15,125 in addition to his separation pay. Id. at 731.

In Prunella v. Carlshire Tenants, Inc., 94 F.Supp. 2d 512 (SDNY 2000), Judge Conner found a voluntary waiver where the plaintiff engaged in negotiations over the terms, had several weeks to ponder settlement, met with his union's lawyer about whether to sign, and received $5,000 more than he was intitled to under the terms of the collective bargaining agreement. Id. at 516-517.

In Cordoba v. Beau Deitl & Associates, 2003 WL 22902266 (SDNY 2003), Judge Mukasey found that a waiver was entered into knowingly and voluntarily, where the plaintiff had an associate business degree in accounting, had been employed for 25 years, had four days to

examine the release before signing, where the release advised the plaintiff of the right to consult an attorney, and where the plaintiff did, in fact, speak with an attorney. Id. at *5-6.

In Glugover v. Coca-Cola Bottling Co. of New York, 1993 WL 312269 (SDNY 1993), Judge Leisure found that a waiver wasn't knowing and voluntary because the plaintiff did not negotiate the terms of the release and did not want to sign it, because it was unclear that the benefit being paid exceeded what plaintiff was already entitled to, and because there was a factual dispute about whether the plaintiff, when given the release, was encouraged to consult an attorney or had a fair opportunity to do so. Id. at *10-11.

In Gorman v. Earmark, Inc., 968 F.Supp. 58 (D. Comm. 1997), Judge Arterton found a lack of voluntariness even though the plaintiff was an experienced business person with a college degree. He had not seen the agreement prior to signing it and had at most ten minutes to consider signing it. A dispute of fact existed whether he was advised that he could consult an attorney and delay signing the document, and whether he received "additional consideration" in exchange for the release.

A number of factors here preclude a finding that the release was entered into knowingly and voluntarily.

a.     Plaintiff received the document on May 25, 2005, only 14 days before she stopped work due to her disability. During this period, she was in great pain and was taking narcotic painkillers and muscle relaxants. After June 9, she was flat on her back, still on medication. This seriously compromised her ability to "knowingly" consider a very complicated offer from JP Morgan Chase.

b.     Contrary to the assertion in its motion papers, the letter about the severance package said nothing about consulting an attorney, and defendant's agent in presenting this

document, Dee Lakhani, never said a word about consulting an attorney. All Lakhani told Ms. Pinsky was that she would not be able to continue with JP Morgan Chase in another position unless she signed the release.

c.    Ms. Pinsky did not sign the release until she was into her third week of leave status — a leave which extended the date by which the document was to be returned. Ms. Pinsky gained no immediate benefit from signing, and did so, under the influence of narcotics and muscle relaxants, because Ms. Lakhani repeatedly called and told her (inaccurately) that he future employment depended on the Release being signed.

d.    Unlike the release in <u>Nicholas v. NYNEX</u>, neither the severance proposal letter nor the Release itself emphasized the fact that Ms. Pinsky was waiving important rights, nor did the release emphasize plaintiff's right to consult an attorney before signing.

e.    Ms. Pinsky never engaged in any discussion or negotiation over the terms of the Release and could say at her deposition only that she "sort of" understood it.

Most disturbing here is the fact that Ms. Pinsky signed the Release <u>after</u> she suffered her injury — an injury which entitled her to compensation — but received nothing as a result of signing the Release which compensated her for her injury. The benefit she received was the same as all other JP Morgan Chase employees and reflected nothing extra as a result of her work-related injury. The Release makes no reference to that injury. Any attorney who would have reviewed the Release would have raised the issue, particularly in light of Ms. Pinsky's doctor's belief that Chase's actions exacerbated her injury.

Certainly, on the facts before this Court, there can be no finding that as a matter of law, Ms. Pinsky knowingly and voluntarily entered into an agreement to release all claims, particularly where the Court is required to view the facts in the light most favorable to plaintiff.

The factors which prevent a finding of knowing and voluntary action under the federal standards also preclude giving the Release some preclusive effect under New York law.[1]  New York law, like federal law, requires that the party relying on the release carry the burden of showing that the release was "knowingly and voluntarily" entered into, and that the courts are to examine the "totality of the circumstances."  We believe, in fact, that the undisputed facts would allow the Court to take the waiver issue out of the case and find that the Release was not enforceable.

## POINT II

### SUMMARY JUDGMENT CANNOT BE GRANTED ON THE FAILURE TO ACCOMMODATE CLAIMS.

The key prong of the failure to accommodate claims in this case is the question of whether the employer refused to make the accommodation.

It is preposterous for defendant to argue that the "undisputed facts establish that the bank provided plaintiff with such an accommodation.

Plaintiff does not dispute that an employer need not provide a requested accommodation as long as it provides a reasonable substitute.  Felix v. NYC Transit Authority, 154 F.Supp. 2d 640, 655 (SDNY 2001), aff'd 324 F.3d 102 (2d Cir. 2003).  Here, the employer provided a substitute, but it provides no support for its assertion that the substitute was either reasonable or that it accommodated plaintiff's disability.  Plaintiff's doctor prescribed a "standing desk" to alleviate stress on plaintiff's hip.  The service desk may have been something plaintiff could stand behind, but it was not a "standing desk."  As the literature and testimony show, a standing

---

[1] As a federal court, this Court should not be applying federal waiver law in connection with federal claims and state waiver law in connection with state waiver claims.  The Bormann standards are applicable to all claims being litigated in this Court.

desk is an ergonomically designed piece of furniture which is adjustable. It comes with a special chair which itself can be adjusted and which has foot support.

Plaintiff, in opposing this motion, has submitted a declaration from her treating physician stating not only that the type of desk at which plaintiff was placed was inadequate, but that in his medical opinion it exacerbated her condition.

Defendant, in making this motion, provides no testimony either from a physician or from an ergonomic expert establishing that the service desk plaintiff was placed at was a reasonable substitute and that its use accommodated "acute strain/sprain syndrome of the lumbosacral spine and pelvis." It relies, entirely, on a representation from a banking supervisor that, in her opinion, the service desk "sounded" a lot like the "standing desk" recommended by plaintiff's doctor and approved by Chase's Medical Department.

Defendant cannot argue that the Chase Medical Department made any meaningful evaluation of the substitution. No one from the Medical Department came to view the service desk or chair; no one from Medical spoke to Ms. Pinsky or consulted with her physician about the substitution. A nurse answering simply accepted Ms. Lakhani's disputed statement that Ms. Pinsky found the service desk to be an acceptable substitute, and stated that the department could substitute the service desk "if it accommodated her disability."

If Chase's summary judgment argument on this issue comes down to an assertion that Ms. Pinsky agreed to the accommodation, that assertion is clearly in dispute. Ms. Pinsky disputes speaking ot Ms. Lakhani about the desk in April and denies ever stating that it worked well. She has submitted statements from other employees who heard her complain about her seating throughout April and May 2005 and heard her talk about her wait for a standing desk. Plaintiff's own e-mails evince a belief that she was expecting a "standing desk" to be delivered

14

as late as May 31, 2005.  And plaintiff has submitted photos showing her sitting in the chair at the service desk; the photos show simply a tall table with a tall chair, with no foot support.

Nothing in the record before this Court supports a finding in favor of defendants on the "reasonableness" issue as a matter of law.

## POINT III

### SUMMARY JUDGMENT IN DEFENDANT'S FAVOR ON THE COUNTERCLAIMS WOULD BE INAPPROPRIATE.

Defendant has not asserted a counterclaim alleging a breach of its Code of Conduct, which may or may not be enforceable as a contract.  It has sued plaintiff for "fraud" and for "unjust enrichment."  Nowhere in its submission does defendant argue that it has met the legal requirements for either cause of action.  Nor does it assert a set of facts, in its motion, which would support such causes of action.

In its counterclaims, as pled, defendant asserts that plaintiff fraudulently asserted that she was disabled (see ¶ 67) when she was no longer disabled, and that she intentionally "misled JP Morgan Chase regarding her alleged disability" (¶ 74) and that Chase was induced into keeping Ms. Pinsky on disability leave by this misinformation (¶ 75).

Defendant submits nothing more than an argument that by investing in Tri-State Biodiesel and by accepting the title Chief Administration Officer, without preclearance, plaintiff may have violated the Code of Conduct.  It argues that if it had known, it may have terminated plaintiff's employment earlier than it did.  In fact, defendant knew about Tri-State Biodiesel when it filed its first counterclaim on June 4, 2007; yet it did not terminate her employment until September 2007, after Hartford determined that plaintiff was no longer disabled.  The breach of

contract claim it asks the Court to grant summary judgment on, which does not even exist in its

Counterclaim, is wholly based on speculation and is not supported even by the actions Chase did

or did not take between May 2007 and September 2007.

Furthermore, even if somewhere in the Counterclaim, as pled, there is a breach of

contract claim, serious issues of fact exist about whether Ms. Pinsky's activities with Tri-State

Biodiesel required preclearance: she owned 1/200 of the company's stock, and her role was

largely limited to reviewing documents and taking minutes at meetings — while laying flat on

her back. Ms. Pinsky was not a director, and Tri-State Diesel did not even hold its first

director's meeting until 2008. Even on the unpled breach of contract claim, defendant's

submissions do not meet the standards for summary judgment.

The facts defendant relies on do support, however, a grant of summary judgment in

plaintiff's favor, dismissing the fraud and unjust enrichment counterclaims.

### CONCLUSION

For the above-stated reasons, defendant's Motion for Summary Judgment should be denied.

Dated: New York, New York
       June 18, 2008

                                        SCHWARTZ, LICHTEN & BRIGHT, P.C.
                                        Attorneys for Plaintiff

                                        By: _____
                                            Arthur Z. Schwartz
                                            275 Seventh Avenue, 17th Floor
                                            New York, New York  10001
                                            (212) 228-6320

16