UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

SUSAN PINSKY,                                           :

                Plaintiff,        :

                                                   ECF
     - against -                                        :
                                                   07 Civ. 3328 (CM) (HP)
JP MORGAN CHASE & CO.,                                 :

                Defendant.    :

-----------------------------------------------------------------X

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**JPMORGAN CHASE LEGAL AND COMPLIANCE DEPARTMENT**
Frederic L. Lieberman
Assistant General Counsel
One Chase Manhattan Plaza, Floor 26
New York, New York 10081
(212) 552-1815
frederic.l.lieberman@jpmchase.com

Attorneys for Defendant

TABLE OF CONTENTS

| | Page |
|---|---|
| Table of Authorities………………………………………………………….. | i |
| Preliminary Statement………………………………………………………… | 1 |
| ARGUMENT……………………………………………………………….. | 1 |
| I    NO MATERIAL ISSUE OF FACT EXISTS ON WHICH A JURY COULD FIND THAT PINSKY'S EXCUTION OF THE RELEASE WAS NOT KNOWING AND VOLUNTARY…………………………………………….. | 1 |
| II   PLAINTIFF HAS NOT PRODUCED ANY ADMISSIBLE EVIDENCE SHOWING THAT THERE IS A MATERIAL FACTUAL DISPUTE AS TO WHETHER DEFENDANT PROVIDED HER WITH A REASONABLE ACCOMMODATION CONSISTENT WITH THE STATED RECOMMENDATION OF HER CHIROPRACTOR……………. | 5 |
| III  PLAINTIFF DID NOT SHOW ANY MATERIAL FACTUAL ISSUE REGARDING HER VIOLATION OF THE BANK'S CODE OF CONDUCT WHEN SHE PERFORMED SERVICES FOR, ACTED AS AN OFFICER OF, AND INVESTED IN TRI-STATE BIODIESEL WHILE STILL A BANK EMPLOYEE ……………………………… | 8 |
| Conclusion……………………………………………………………….. | 10 |

TABLE OF AUTHORITIES

**Cases**                                                            **Page**

Bormann v. AT&T Communications, Inc., 875 F.2d 399, 403 (2nd Cir.),
       cert. denied, 493 U.S. 924 (1989)………………………………………..     2

Livingston v. Adirondack Beverage Co., 141 F.3d 434, 438 (2nd Cir. 1998)………     2

# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## Preliminary Statement

Plaintiff's immaterial factual allegations notwithstanding, Defendant's motion for summary judgment presents three simple issues:

1) Whether the undisputed material facts demonstrate that Plaintiff's June 24, 2005 execution of a General Release in connection with the elimination of her position and the offer of severance benefits was "knowing and voluntary"?

2) Whether the undisputed material facts demonstrate that the Bank provided Plaintiff with a reasonable accommodation that complied with the limited provision of equipment recommended by Plaintiff's chiropractor?

3) Whether the undisputed material facts demonstrate that Plaintiff's admitted status as the Chief Administration Officer of Tri-State Biodiesel while still an employee of the Bank violated the Bank's Code of Conduct?

## ARGUMENT

### I

### NO MATERIAL ISSUE OF FACT EXISTS ON WHICH A JURY COULD FIND THAT PINSKY'S EXECUTION OF THE RELEASE WAS NOT KNOWING AND VOLUNTARY

Plaintiff offers a hodgepodge of reasons why the General Release that she executed should not be enforced. Plaintiff, however, has not shown the existence of any facts upon which a jury could conclude that her June 24, 2005 execution of the General Release of all claims against the Bank, in the "totality of the circumstances" was not "knowing and voluntary". Accordingly, the Bank is entitled to summary judgment on the ground that the General Release is enforceable and all of the claims raised by Plaintiff in this action are barred by it.

Though citing to different cases, <u>Livingston v. Adirondack Beverage Co.</u>, 141 F.3d 434, 438 (2nd Cir. 1998), Defendant's Memorandum in Support ("Def. Mem.") at 16, and <u>Bormann v. AT&T Communications, Inc.</u>, 875 F.2d 399, 403 (2nd Cir.), <u>cert. denied</u>, 493 U.S. 924 (1989), Plaintiff's Memorandum in Opposition ("Pl. Mem.") at 9, the parties agree on the factors to consider in determining whether Plaintiff's release was "knowing and voluntary". The undisputed facts establish that, of the eight factors, no more than two, i.e., Plaintiff's role in deciding the terms of the release and whether she was represented by or consulted an attorney, favor Plaintiff. All six remaining factors favor the Bank.

Plaintiff contends that the Release is invalid because the Bank did not "advise [her] to consult an attorney", noting that the "letter from Lakhani said nothing about an attorney (see Defendant's Ex. 24)".[1] Pl. Dec. ¶ 16. In fact, the Release signed by Plaintiff specifically states that "I hereby certify that … I have been advised to discuss the RELEASE with an attorney of my choosing…." Def. Ex. 25 at page 5.

Plaintiff also contends that the Release was not knowing and voluntary because, "[b]y the end of May, she was in tremendous pain and was getting by only because she was taking many painkillers", and "[s]he was in no medical or emotional state to consult an attorney." Pl. Mem. at 5; <u>id.</u> at 11. From May 25, 2005 (when Plaintiff claims to have first received the job elimination letter and proposed General Release) through June 24, 2005 (the date when Plaintiff executed the General Release), however, Plaintiff continued to perform her duties regarding numerous home equity loans. During that period, Plaintiff sent more than 200 emails concerning various home

---

[1]   Plaintiff refers to Def. Ex. 24 because Defendant's Memorandum mistakenly cited that Exhibit as containing the advice to consult an attorney. However, in response to a voicemail message left by Plaintiff's attorney on Friday, June 13, 2008 at 5:04 p.m. Defendant's attorney then left a message for Mr. Schwartz on June 16, 2005, prior to the submission of Plaintiff's opposition papers, advising him that the reference to Exhibit 24 was a typographical error, and that the citation should have been to Exhibit 25, the General Release.

2

equity loans on which she was working. Def. Reply Ex. "1". If Plaintiff was capable of performing her duties on behalf of the Bank with respect to these substantial and complicated monetary transactions, there is no legitimate reason why she would be simultaneously incapable of making a knowing and voluntary decision on her own behalf to execute the General Release.

Plaintiff also seems to suggest that the Bank is responsible for her original hip injury, that she is entitled to compensation from the Bank for that injury, that the Release failed to make provision for that alleged "work-related injury", and that the Release therefore is somehow invalid. Pl. Mem. at 12. Even if true, this could show only that Plaintiff made a bad decision when she signed the Release. Bad judgment, however, is not a ground for concluding that the decision to sign the Release was not knowing and voluntary. In any event, there simply is nothing in the record to support such a suggestion. Other than a Workers' Compensation claim filed by Plaintiff in December 2005 asserting that Plaintiff first injured her hip while working at a different branch in December 2004 by sitting for too long, Def. Reply Ex. "4", and later withdrawn, Pl. Tr. 95, Plaintiff did not file any claim against the Bank regarding any such injury. Moreover, medical records obtained during discovery show that Plaintiff first consulted Dr. Weinberg, the chiropractor who submitted the note regarding the standing desk, in April 2004, when Plaintiff first injured her back while working out at her health club. Def. Reply Ex. "5".

Plaintiff also contends for the first time that Dee Lakhani "guarantee[d] that [Plaintiff] would get a new job if, and only if, she signed the Release". Pl. Mem. at 5. Plaintiff, who does not cite to any support for that contention, never made this allegation until now – not in any email, her charge of discrimination, her Complaint or Amended Complaint, her deposition, or her questioning of Lakhani at her deposition. In fact, in the Release, Plaintiff certified that "Neither JPMC nor its agents or representatives have made, and I am not relying upon, any

3

representations to me concerning the terms or effects of this RELEASE other than those contained herein." Def. Ex. 25 at page 5. Moreover, Plaintiff also first answered "no" to the question whether anyone ever "guaranteed" that she would get a new position, see Pl. Tr. 63, then testified that Lakhani "did guarantee" that she could get job in the mortgage company, in which Plaintiff was not interested. Id. 64-66. However, even in Plaintiff's testimony, she does not state that Lakhani told her that she had to sign the Release in order to get another position.

Plaintiff also opines that she was "sure that [she] would land another job at Chase, like most of the other HELOs did", Pl. Dec. ¶ 2, and that "[m]ost of the other HELOs in my division were successful in obtaining other positions at Chase. (See Response to Interrogatories, annexed as Exhibit D.)". Pl. Dec. ¶ 15. In fact, however, of the nine (9) other HELOs who reported to Lakhani, only four (Gittens, Harris, Lippman, and Saini) obtained new positions at Chase directly from the HELO position, while three (Flynn, Nuchurch, and Nichols-Paul) did not obtain new positions until late 2005 or in 2006, after a leave or absence or as re-hires, and two (Brillhart and Howard) left Chase's employ in the spring of 2005. See Pl. Ex. D.

Finally, Plaintiff contends that her 60 day job search period was suspended when she went on leave, Pl. Dec. ¶¶ 18; Pl. Mem. at 5, as was the signing date for the General Release, id. at 12, and therefore the General Release somehow did not become effective. However, she cites no support for the assertion that the job search period was tolled and neither the May 20, 2005 job elimination letter nor the General Release so provide. See Def. Exs. "24" and "25". Moreover, the General Release explicitly provides and Plaintiff certified that she understood that "the Release becomes immediately effective upon such execution". Def. Ex. "25" at page 5.

Plaintiff's assumption that the suspension of her termination date due to of her leave also suspended her job search and the Release execution period is incorrect. See Lieberman Reply

4

Aff. ¶ 6; Def. Reply Exs. "2" and "3". The Toolkit used by Human Resources for group position eliminations now states that "[t]he notice period will continue while the employee is on a leave of absence. If while on leave the 60-day notice period has been exhausted, the employee will remain on leave until the end of the approved leave. At the end of the leave (including those who are released from LTD), the employee will be terminated with severance provided the employee has executed the Release". Id.

Plaintiff has failed to show the existence of any facts upon which to conclude that the General Release was not "knowing and voluntary". Accordingly, the General Release should be enforced and Defendant's motion for summary judgment granted.

## II

### PLAINTIFF HAS NOT PRODUCED ANY ADMISSIBLE EVIDENCE SHOWING THAT THERE IS A MATERIAL FACTUAL DISPUTE AS TO WHETHER DEFENDANT PROVIDED HER WITH A REASONABLE ACCOMMODATION CONSISTENT WITH THE STATED RECOMMENDATION OF HER CHIROPRACTOR

Plaintiff offers a variety of arguments why the Customer Service Desk that the Bank had her use was not a reasonable accommodation for her chiropractor's single recommendation that she be provided with a "standing desk" so that she could work while standing and not have to sit for more than a limited period. Plaintiff, however, has not shown the existence of any facts upon which a jury could conclude that the Customer Service Desk was an inadequate accommodation. Accordingly, the Bank is entitled to summary judgment.

Plaintiff instead seeks a trial on a claim that the Bank did not provide her with a reasonable accommodation in two specific ways that were not included in her chiropractor's recommendation. Thus, although Dr. Weinberg stated only that Plaintiff "would benefit from the use of a 'standing desk', to avoid having to sit while working for more than [20 to 30 minutes]", Def. Ex. "7", Plaintiff now contends that the Bank failed to provide her with an "ergonomically

5

designed standing desk" that "comes with a matched, ergonomically structured chair". Pl. Dec. ¶ 5. Since Plaintiff did not request the Bank to provide such specific accommodations, the Bank cannot now be faulted for not doing so. As it is undisputed that the Bank provided Plaintiff with a workstation used throughout its retail branches at which she, like other employees, could work while standing, as Dr. Weinberg recommended, the Bank is entitled to summary judgment.

Plaintiff essentially contends that the Customer Service Desk, although designed to be used while either standing or sitting, is not a standing desk because it does not have an adjustable work surface and because the "chair associated with the [customer service desk] could not be adjusted to alleviate my disability, and had no means of foot support or relief". Pl. Dec. ¶ 10. Thus, she states that "a standing desk is an ergonomically designed piece of furniture which is adjustable. It comes with a special chair which itself can be adjusted and which has foot support." Pl. Mem. at 13-14; see also Weinberg Dec. ¶ 5. Plaintiff also submitted a website printout regarding one such standing desk (at a cost of between $2,700 and $4,000). Pl. Dec. ¶ 5 and Pl. Ex. A. Neither Dr. Weinberg nor Plaintiff brought any of this information to Defendant's attention. Def. Ex. "7". In fact, Dr. Weinberg knew to do so because, in May 2004, he completed a JPMorgan Chase Certification of Health Care Provider form regarding Plaintiff for submission by her to the Bank regarding a back injury she suffered the previous month. Def. Reply Ex. "6". At that time, Dr. Weinberg specifically wrote: "No prolonged sitting; Ptn. should be given ergonomically correct chair". Id. at page 3.

Plaintiff's emphasis on an "ergonomically designed standing desk", Pl. Dec. ¶ 5 and Pl. Ex. "A", is misleading. Not all standing desks, however, are adjustable ergonomic desks. Thus, according to Wikipedia, there are both "fixed height standing desks and ergonomic standing desks". Def. Reply Ex. "7"; see also Def. Reply Ex. "8".

With her Declaration, and in support of her contention that she was not provided with an "ergonomically structured chair", Plaintiff also submits five photographs that she describes as showing her "sitting at the service desk I was assigned to, demonstrating the lack of support provided by the desk when I was sitting". Pl. Dec. ¶ 10 and Pl. Ex. "B". She describes the photos as "simply show[ing] a tall table with a tall chair, with no foot support." Pl. Mem. at 15. For a number of reasons, the photographs do not support Plaintiff's contention.

First, although Defendant served discovery requests that called for the production of any photographs, see Def. Reply Ex. "9", Definition 6 and Requests 17, 60, 64, 65, and 73, Plaintiff never produced any photographs. See Lieberman Reply Aff. ¶ 12. Moreover, the photographs contain no sufficient temporal or other identifying information to permit their use as evidence.

The apparent reason why Plaintiff did not produce these photographs before is that they are recently created and staged photographs that could not have existed until late December 2007 at the earliest. In the background of the second photograph is a Bank marketing campaign banner which the Bank did not use until January 2008. Celso Reply Aff. ¶¶ 4-7. Thus, these photographs could not have been taken any earlier than late December 2007, much less in 2005.

Finally, in staging these photographs, Plaintiff also appears to have adjusted the height of the chair so that she is sitting too high for the desk and so that her feet do not reach the foot support. See Pl. Ex. B. Despite doing so, the first, third, and fourth photographs clearly show a circular foot support near the bottom of the chair, as well as a set of two tubes (a smaller one sitting in a larger one) that are part of the mechanism used to adjust the chair's height. Id.

Plaintiff argues that she "complained repeatedly about the slow pace in getting the standing desk and made her discomfort known to everyone on the bank floor", Pl. Mem. at 4, and that "[b]etween April 8, 2005 and May 31, 2005, [she] made numerous complaints to

7

Zimmer, Centeno, Lakhani, and her fellow employees". Id. Interestingly, however, between April 8, 2005 and May 31, 2005 and in contrast to the volume of emails she sent during February, March and early April regarding her request for an accommodation, Plaintiff does not even contend that she sent even a single email to either her manager, her Human Resources Business Partner, or the Bank's nurse who handled her request for an accommodation, complaining about not receiving the standing desk or making her discomfort known to them.

Instead, Plaintiff submits Declarations from three colleagues, Caroline Cumiskey, Diana Czuchta, Christopher Guerrara. None of these people, however, were identified by Plaintiff in her Rule 26 disclosures and only Czuchta was identified in Plaintiff's interrogatory answers. See Def. Reply Exs. "12" and "13". Moreover, incredibly, the three Declarations are identical in all meaningful respects. Thus, each witness asserts that "[a]fter a week, I actually observed Ms. Pinsky holding herself up on her forearms so as not to put weight on her lower back." Czuchta, Cumiskey, Guerra Decs. at ¶ 3. These Declarations are not probative and should be disregarded.

Plaintiff has failed to show the existence of any facts upon which to conclude that the Bank did not provide her with a reasonable accommodation that satisfied the recommendation of her chiropractor. Accordingly, Defendant's motion for summary judgment granted.

### III

**PLAINTIFF DID NOT SHOW ANY MATERIAL FACTUAL ISSUE REGARDING HER VIOLATION OF THE BANK'S CODE OF CONDUCT WHEN SHE PERFORMED SERVICES FOR, ACTED AS AN OFFICER OF, AND INVESTED IN TRI-STATE BIODIESEL WHILE STILL A BANK EMPLOYEE**

Plaintiff weakly asserts that her relationship with Tri-State Biodiesel did not violate the Bank's Code of Conduct, which requires that its employees obtain pre-clearance before holding positions with other organizations. Plaintiff, however, has not shown the existence of any facts upon which a jury could conclude that she did not violate the Code of Conduct. Accordingly, the

Bank is entitled to summary judgment on its claims that, by violating the Bank's Code of Conduct, Plaintiff is liable to the Bank for fraud, unjust enrichment, and breach of contract.

First, Plaintiff argues that "serious issues of fact exist about whether Ms. Pinsky's activities with Tri-State Biodiesel required preclearance: she owned 1/200 of the company's stock, and her role was largely limited to reviewing documents and taking minutes at meetings – .... Ms. Pinsky was not a director, and Tri-State Diesel did not even hold its first director's meeting until 2008." Pl. Mem. at 16. This last-minute attempt to minimize her Tri-State role should be disregarded. As she describes it, a group of people including Plaintiff had an idea to establish a specific business, created a corporation to do so, invested their money, contributed their time and energy, designated specific members of the group as officers of the company, including Plaintiff, had a corporate seal, held meetings, and kept minutes of those meetings. Id. at 6-7. As a whole, these simply are not activities that any meaningful reading of the Code of Conduct would conclude can be performed by a Bank employee without obtaining pre-clearance.

Second, in any event, despite Plaintiff's misleading contention that the Code of Conduct requires pre-clearance only "for positions 'similar' to holding 5% interest in business or being a director (which she was not), general partner, or owner", Pl. Mem. at 7, the Code of Conduct clearly states that a Bank employee is "required to pre-clear: ... whether or not you will be paid, any affiliation with another business as a[n] ... officer ...." Def. Exs. "36", "37", and "38". Plaintiff, who "helped write" her Tri-State website blurb, Pl. Tr. at 112, statying "Susan Pinsky, Chief Administration Officer - ... She currently manages all the City and State Licensing, the Company registrations and the financials," Def. Ex. "42", and who signed her Tri-State investment Subscription Agreement, handwriting her title as "Chief Administration Officer", Def. Ex. "44" at p. 8; Pl. Tr. 13, cannot meaningfully dispute that she was a Tri-State officer.

9

Third, Plaintiff contends that she did not "believe that Chase needed to approve her limited involvement with Tri-State." Pl. Mem. at 7. Of course, the real reason for Plaintiff's belief is that, as she testified, she didn't read the Code of Conduct. Pl. Tr. at 38, 41.

Finally, Plaintiff argues that Defendant "knew about Tri-State Biodiesel when it filed its first counterclaim on June 4, 2007; yet it did not terminate [Plaintiff's] employment until September 2007", Pl. Mem. at 15, somehow suggesting that this passage of time renders Defendant's counterclaims meritless. In fact, during that period, Defendant was in the process of obtaining documents from Tri-State via subpoena. Defendant did not even receive Tri-State's complete production of documents until mid-August, 2007. Defendant and its counsel then had to review the information in their possession and determine the proper course of action.

Plaintiff has failed to show the existence of any facts upon which to conclude that she did not violate the Bank's Code of Conduct. Accordingly, Defendant's motion for summary judgment should be granted as to its counterclaims.

## CONCLUSION

The Court should grant Defendant's motion for summary judgment, dismiss all of Plaintiff's claims and this action, and find in favor of Defendants on its counter-claims.

Dated: July 18, 2008

JPMORGAN CHASE LEGAL AND
COMPLIANCE DEPARTMENT

By: _____
Frederic L. Lieberman
Attorneys for Defendant
One Chase Manhattan Plaza, Floor 26
New York, New York 10081
(212) 552-1815
frederic.l.lieberman@jpmchase.com